UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                 :

UNITED STATES OF AMERICA,        :

                                 :

           v.               :         No. 17 Cr. 357 (LAK)

                                 :

DAVID BLASZCZAK,             :
THEODORE HUBER,            :
ROBERT OLAN, and            :
CHRISTOPHER WORRALL,       :

                                 :

                Defendants.   :
---------------------------------------------------------x

## MEMORANDUM OF LAW OF DEFENDANT CHRISTOPHER WORRALL IN SUPPORT OF MOTION FOR A JUDGMENT OF ACQUITTAL

SHEARMAN & STERLING LLP

Stephen Fishbein
John A. Nathanson
599 Lexington Avenue
New York, NY 10022-6069
Telephone:   212-848-4424/8611
Facsimile:   646-848-4424/8611
Email:  sfishbein@shearman.com
           john.nathanson@shearman.com

*Attorneys for Defendant Christopher Worrall*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

     I.     THERE IS INSUFFICIENT EVIDENCE THAT WORRALL HAD ACCESS
          TO THE INFORMATION AT ISSUE ...................................................................5

     II.    THERE IS NO EVIDENCE WORRALL PASSED THE INFORMATION
          AT ISSUE TO BLASZCZAK .............................................................................7

     III.   THE TESTIMONY OF THE GOVERNMENT'S COOPERATING
          WITNESS DOES NOT SUPPORT THE INFERENCE THAT WORRALL
          WAS THE SOURCE FOR THE 2012 RADIATION ONCOLOGY RULE........13

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Fountain v. United States*,
    357 F.3d 250 (2d Cir. 2004) ................................................................4

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ................................................................3

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005) ................................................................4, 15

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) ................................................................3

*United States v. Dinome*,
    86 F.3d 277 (2d Cir. 1996) ................................................................4

*United States v. Glenn*,
    312 F.3d 58 (2d. Cir. 2002) ................................................................4

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999) ................................................................3, 15

*United States v. Lee*,
    833 F.3d 56 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2212 (2017) ................................................................4

*United States v. Macklin*,
    671 F.2d 60 (2d Cir. 1982) ................................................................3

*United States v. Mankani*,
    738 F.2d 538 (2d Cir. 1984) ................................................................4

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991) ................................................................4

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014) ................................................................4

*United States v. Stewart*,
    305 F. Supp. 2d 368 (S.D.N.Y. 2004) ................................................................3

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972) ................................................................3

*United States v. White*,
   673 F.2d 299 (10th Cir. 1982) ...........................................................................................3

*United States v. Wiley*,
   846 F.2d 150 (2d Cir. 1988) ...............................................................................................3

*United States v. Yannotti*,
   415 F. Supp. 2d 280 (S.D.N.Y. 2005) .................................................................................3

**STATUTES & RULES**

18 U.S.C. § 641 ..................................................................................................................4

Fed. R. Crim. P. 29 .......................................................................................................1, 3

Defendant Christopher Worrall respectfully submits this memorandum of law in support of his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c).

## INTRODUCTION

Christopher Worrall was charged in a superseding indictment with participating in a conspiracy, lasting from at least 2009 to 2014, to obtain and use confidential information concerning the rulemaking activities of the Centers for Medicare and Medicaid Services ("CMS"), the federal agency charged with administering the Medicare and Medicaid health programs. *See* ECF No. 137. The indictment alleged that Worrall conspired with David Blaszczak and several hedge fund professionals – Theodore Huber, Robert Olan and Jordan Fogel – to illicitly obtain and use information relating, among other subjects, to: (i) a proposed rule cutting radiation oncology treatment times that was released in July 2012, (ii) a proposed rule cutting reimbursement rates for end stage renal disease ("ESRD") treatments that was released in July 2013, (iii) the final rule concerning the same ESRD treatments that was released in November 2013, and (iv) an internal CMS report relating to ESRD that was relevant to the business of NxStage Medical, Inc. *See id.* The indictment also included, as overt acts in furtherance of the conspiracy, allegations relating to 2009 rulemaking involving radiation oncology and ESRD. *See id.* ¶¶ 27, 45.

Worrall allegedly obtained information relating to these and other subjects through his employment at CMS and passed this information to Blaszczak, a political intelligence consultant and longtime friend, knowing that Blaszczak would give it to his clients, including Huber, Olan, and Fogel at the hedge fund Deerfield Management Company, who would use it to trade securities. In total, Worrall was charged in sixteen counts:

- Two counts covering conspiracies to commit conversion, securities fraud, and wire fraud, (Count 1 and Count 2)

- Eight substantive counts of conversion, wire fraud, and securities fraud relating to the 2012 proposed radiation oncology rule (Counts 3 through 10)

- Two substantive counts of conversion and wire fraud relating to the ESRD report relevant to NxStage (Counts 11 and 12)

- Four substantive counts of conversion, wire fraud, and securities fraud relating to the 2013 proposed ESRD rule (Counts 13 through 16)

In essence, the narrative conveyed in the indictment and by the government at trial was that Worrall was part of an extensive five year conspiracy, the object of which was to steal information from CMS and use it to make millions of dollars in illegal trading profits. The jury rejected this narrative. After a four week trial and four days of deliberations, Worrall was acquitted of fourteen of the sixteen counts in which he was charged, including all charges relating to his participation in the various alleged conspiracies (Counts 1 and 2); all charges relating to ESRD rulemakings (Counts 1 and 2, and 13 through 16); all charges relating to confidential information relevant to NxStage (Counts 1 and 2, and 11 and 12); and all counts relating to securities fraud in connection with the proposed radiation oncology rule (Counts 4 through 8 and 10).

Worrall was convicted of only two counts – one each of conversion (Count 3) and wire fraud (Count 9) – relating to the 2012 proposed radiation oncology rule. However, the jury clearly determined that Worrall did not participate in or receive anything relating to any securities trading that may have been associated with that information, as he was acquitted of all counts of securities fraud relating to that proposed rule. Indeed, as detailed below, the two counts on which Worrall was convicted relate to a single lunch on May 8, 2012, during which Worrall allegedly passed information to Blaszczak. As to that extraordinarily narrow basis for Worrall's conviction, there is insufficient evidence on which any reasonable jury could have convicted him; in fact, the evidence in the record is considerably more consistent with innocence

than with guilt.  His conviction should therefore be reversed and a judgment of acquittal should be entered.

## ARGUMENT

Rule 29 provides that a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  While a court must view the evidence in its totality and "in the light most favorable to the government and all permissible inferences drawn in its favor," the Second Circuit has explained that "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).[1]

Accordingly, "the government must introduce sufficient evidence to allow the jury to reasonably infer that *each essential element* of the crime charged has been proven *beyond a reasonable doubt*."  *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Macklin*, 671 F.2d 60, 65 (2d Cir. 1982)) (emphasis added).  A judgment of acquittal is appropriate when the court has determined that "the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).  If the court "concludes that upon the evidence there must be such a doubt in a reasonable mind, [it] must grant the motion." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

Consequently, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'"  *D'Amato*, 39 F.3d at 1256 (citing *United States v.*

---

[1] Courts in the Second Circuit have affirmed or ordered a judgment of acquittal where the defendants' conviction rested on unsupported inferences or guesswork.  *See, e.g.*, *United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988); *United States v. Yannotti*, 415 F. Supp. 2d 280 (S.D.N.Y. 2005); *United States v. Stewart*, 305 F. Supp. 2d 368 (S.D.N.Y. 2004).

*Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991); quoting *United States v. Mankani*, 738 F.2d 538,

547 (2d Cir. 1984)).  As the Second Circuit has emphasized, "at the end of the day, 'if the

evidence viewed in the light most favorable to the prosecution gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must

necessarily entertain a reasonable doubt.'"  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir.

2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d. Cir. 2002)); *see United States v.*

*Newman*, 773 F.3d 438, 451-55 (2d Cir. 2014) (evidence insufficient where alleged tips were

equally consistent with authorized disclosures as with improper ones).

    In order to have convicted Worrall of conversion[2] and wire fraud[3] as to the radiation

oncology proposed rule announced in July 2012, the jury would have had to find beyond a

reasonable doubt that Worrall had the radiation oncology information[4] and that he transmitted it

to Blaszczak.  Even looking at the facts in the light most favorable to the government, no

reasonable jury could have come to that conclusion.

---

[2] The elements of conversion under 18 U.S.C. § 641 are "(1) stealing or converting, (2) with intent to steal or convert, (3) a thing of value (4) that belongs to the government." *United States v. Lee*, 833 F.3d 56, 65 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2212 (2017).  The "thing" at issue here is information about the 2012 radiation oncology rule; if there is insufficient evidence on which the jury could base a finding beyond a reasonable doubt that Worrall had (element 3) or provided (element 1) that information, the elements of conversion cannot be satisfied.

[3] The "essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)).  The alleged scheme here is stealing government property and the property at issue is the information about the 2012 radiation oncology rule; as with conversion (*supra* note 2), if there is insufficient evidence on which the jury could base a finding that Worrall had the information (the "property") or provided it (the "scheme"), the elements of wire fraud cannot be satisfied.

[4] Worrall expressly preserves his argument and those of the other defendants that the crime of conversion does not extend to information, but is rather limited to tangible property. *See, e.g.*, ECF Nos. 75, 80, 145.

## I.   THERE IS INSUFFICIENT EVIDENCE THAT WORRALL HAD ACCESS TO THE INFORMATION AT ISSUE

In 2012, CMS's Hospital Ambulatory Policy Group ("HAPG") drafted a proposed radiation oncology rule that reduced the amount of radiation treatment time for which CMS would reimburse providers.  (Hartstein Tr. 2374-75).  While iterations of the draft rule were circulated by email within CMS, Worrall was not copied on any of these emails.  (GX 1310, DX 314, DX 315-R, DX 316-R, DX 317-R, DX 318-R, DX 319-R, DX 320, DX 321, DX 322-R).  Although the government collected Worrall's laptop, his calendar and his emails from CMS's servers (as well as emails and documents from many other CMS employees), there is no evidence that any version of the draft rule was forwarded or otherwise provided to him.  (Moore Tr. 2349-51; Shimko Tr. 2806).  That is consistent with the testimony of CMS employees with respect to those who typically received draft rules; the drafts were generally circulated to individuals involved in the relevant rulemaking – in this case, members of the HAPG group – and those who were in the rulemaking approval chain.  (Blum Tr. 393-94; Bassano Tr. 2009).

Worrall was not a member of HAPG.  (Hartstein Tr. 2501).  As Amy Bassano and Mark Hartstein, the first and second most senior supervisors of HAPG in 2012, testified, Worrall had nothing to do with drafting, reviewing, or approving the 2012 rule.  (Bassano Tr. 2002-03; Hartstein Tr. 2503-04).  There is no evidence that he was even invited to any meeting at which the rule was scheduled to be discussed.  Indeed, Worrall was, as a general matter, uninvolved in rulemaking.  (Bassano Tr. 2002-03; Moore Tr. 2342-46).  In fact, there was not a single document introduced into evidence suggesting that Worrall had any information about radiation oncology or any other matter relating to HAPG in 2012.  Worrall – whose focus was on data analysis of Medicare claims (*e.g.*, Moore Tr. 2342-46) – was sufficiently unfamiliar with HAPG in 2012 that, after he received a promotion to an expanded role at the end of that year, he wrote

an email to Bassano asking if they could "get together just to informally talk about your work and any other insight you can provide about HAPG or other parts of CM? I'm more familiar with the payment systems and processes in Laurence's group [i.e., in a different group, the Chronic Care Policy Group], so I want to talk to the right people so I can better orient myself to their work." (GX 1841).

The government attempted in at least two ways to suggest that Worrall might have heard about the proposed rule in advance of its issuance despite the facts that (a) he had no involvement in drafting, reviewing or approving the rule, (b) he did not receive any draft rule or other document reflecting its contents, (c) he was not invited to any meeting at which the rule was scheduled to be discussed and (d) he lacked familiarity with HAPG.

*First*, the government elicited from witnesses that Worrall was at least at times present at briefings with senior CMS management, the sort of meetings at which proposed and final rules (among various other topics) could theoretically have been discussed. (*See* Blum Tr. 385; Hartstein Tr. 2419; Bassano Tr. 1985). However, no witness could recall Worrall being present at any briefing where the 2012 radiation oncology cuts were in fact discussed. (Bassano Tr. 2124; Hartstein Tr. 2507). Indeed, witnesses did not recall the exact time that Worrall began attending briefings with senior CMS management (*e.g.*, Hartstein Tr. 2504). And it would not be reasonable for a jury to presume that, even if Worrall was present at certain briefings, he was likely (put aside beyond a reasonable doubt) present at briefings involving the 2012 radiation oncology rule. There were many types of briefings with senior management at CMS, including briefings on topics related to Worrall's function within CMS, such as unwarranted spending variation and data monitoring, at which the trial witnesses may have seen Worrall and which – given his role – he was more likely to have attended. (Hartstein Tr. 2505-06; Bassano Tr. 2122-

23).  Even with respect to briefings at which rules may have been discussed, such briefings could occur at various points in the rulemaking process, including prior to a time at which there has been any determination as to a rule's content.  (*See id.*).  In sum, while Worrall may have attended certain unidentified briefings, that is an insufficient basis to infer that he was present at any particular briefing at which the proposed 2012 radiation oncology rule was discussed, particularly given that he was not involved in rulemaking and the absence of any invitation or document indicating he ever attended, or was even invited to, such a meeting.

*Second*, the government elicited from Hartstein that Worrall sat near the HAPG team, (Hartstein Tr. 2418-19), implying that Worrall may have casually heard about the proposed rule from a colleague.  Of course, there is no evidence of any kind that such a conversation occurred, wherever Worrall sat.  Putting that aside, while the government did not ask Hartstein when Worrall sat near HAPG, other evidence established that Worrall did not do so until April 2013, well after the proposed radiation oncology rule was announced (Hartstein Tr. 2503; GX 350-A).

As there is no evidence in the record establishing that Worrall had information about the proposed radiation oncology rule, no reasonable jury could conclude beyond a reasonable doubt that Worrall provided that information to Blaszczak.

## II.     THERE IS NO EVIDENCE WORRALL PASSED THE INFORMATION AT ISSUE TO BLASZCZAK

The timeline presented by the government at trial surrounding the contacts between Worrall and Blaszczak in the period leading up to the proposed radiation oncology rule's release on July 6, 2012 is as follows:

- Documents reflecting CMS's internal proposals concerning the 2012 proposed radiation oncology rulemaking were circulated within CMS prior to May 8, 2012. (*E.g.*, GX 1310). None of these was addressed to Worrall, nor is Worrall listed in any of them as having attended the relevant briefings.

- On May 8, 2012, Blaszczak visited CMS and had lunch with Worrall.  Blaszczak was signed into the CMS building by Worrall at 12:10 PM.  (GX 1947-A, GX 1620).

- On May 8 and 9, 2012 Blaszczak attended a HCPCS meeting at CMS (discussed further below).

- On May 9, 2012 at 11:19 AM, Blaszczak emailed Jordan Fogel at Deerfield, "Wanted to update you on one of your favorite topics." (GX 1619).  The two agreed to set up a call to discuss the matter.  (*Id.*)

- On May 9, 2012 at 12:33 PM, Fogel provided an internal update to Deerfield colleagues regarding his call with Blaszczak. (GX 806).  As to the radiation oncology rule, Fogel wrote, "Radonc update is most interesting - re-evaluating a key time component in main radonc codes and cutting time in half, which essentially cuts the reimb in half or a little less for the main IMRT code, so blended 25-30% or larger cuts." (*Id.*)  In the same email, Fogel also provided an update on Myriad Genetics and CMS's Clinical Lab Fee Schedule.  (*Id.*)

- On June 5, 2012 Blaszczak attended a HCPCS meeting and had lunch at CMS.  (GX 1655, GX 3010, Shimko Tr. 2806).  (However, there is no evidence that Blaszczak saw Worrall on that day.)

- On June 22, 2012, at 12:55 PM, Worrall signed Blaszczak into CMS. (GX-1952-A).

- On July 6, 2012 the proposed rule was released. (Bassano Tr. 1951).

While this timeline does prove that Worrall and Blaszczak had lunch on one occasion – May 8 – and that Blaszczak had relevant information the following day, a thorough analysis of the evidence concerning Blaszczak's activities and contacts with Deerfield during this period shows that no reasonable jury could infer beyond a reasonable doubt that the one resulted in the other.

*First*, as detailed in the prior section, there is no evidence that Worrall received the draft rule or its contents prior to May 8 (or at any other time prior to the proposed rule's release). Multiple witnesses testified that documents discussing proposed rules were distributed intentionally to only those individuals who needed to have access to that information as they were involved in a policymaking function of CMS, even if that individual might not have attended a meeting about the rulemaking at issue.  (Blum Tr. 393-94; Bassano Tr. 2009; Brock

Tr. 2914-15).  Worrall is not on any of the distributions.

*Second*, on May 8, 2012, CMS hosted the first day of a meeting regarding the Healthcare Common Procedural Coding System ("HCPCS") at its Baltimore campus; that meeting continued on May 9, 2012.  (DX 15, DX 18).  Many CMS employees attend these meetings, both as speakers and audience members.  (Blum Tr. 444).  One of the speakers at the May 8 HCPCS meeting was Anne Hauswald, Director of the Division of Ambulatory Services within HAPG, the group responsible for the proposed radiation oncology rule.  (DX 15).  Various topics were discussed during the meeting related to radiopharmaceuticals and other issues within the purview of HAPG.  (*Id.*).  Approximately one hundred people attended the meeting on May 8, and approximately eighty people attended the meeting on May 9.  (DX 15, DX 18).

*Third*, Blaszczak attended both days of the HCPCS meetings at CMS.  On May 8, when Worrall signed Blaszczak into CMS and they had lunch, Blaszczak noted the reason for his visit as "HCPCS."  (GX 1947-A).  The following day, May 9, Blaszczak again reached out to Worrall to see if they could have lunch again, but Worrall declined because he "[h]ad to run to the pool store to buy some stuff."  (GX 1620).  While the evidence is unclear as to precisely who Blaszczak saw at CMS on May 8 and May 9 beyond Worrall while at the HCPCS meeting, it is undisputed: (a) that Blaszczak was at CMS to attend a two-day HCPCS meeting (GX-1947-A) (b) that Blaszczak had many contacts at CMS generally and within HAPG specifically, including Hauswald who spoke at the May 8/9 HCPCS meeting (DX 15; Samuels Tr. 1536); (c) that when Blaszczak went to CMS, he "hung out in the lunch room," "walked the halls," and would generally talk to "various people" (Epple Tr. 2675; *see also* Samuels Tr. 1693-94, 1706, 1710, 1719, 1721); and (d) that he reached out specifically to at least one other person – his friend Janet Brock – in advance of the May 8/9 HCPCS meeting (GX 1618).

*Fourth*, Blaszczak initially made contact with Fogel to arrange a time to provide what turned out to be information about the radiation oncology rule – among other things – at 11:19 AM on May 9, roughly twenty-three hours after meeting with Worrall.  Blaszczak's presence at the HCPCS meeting at CMS during the intervening period considerably weakens any possible inference – and in the best light it is no more than an inference – that any information Blaszczak provided to Fogel came from Worrall and not some other CMS employee.  That inference is further weakened by the involvement in this particular HCPCS meeting of Hauswald, who was on relevant distributions (DX 315), and other HAPG team members, who were far more likely than Worrall to have had the relevant information.  (DX 15).  And (if not dead already) the inference is weakened once again by the wording of Blaszczak's email to Fogel on the morning of May 9, in which Blaszczak writes, "Wanted to update you on one of your favorite topics." (GX 1619).  It is unlikely that Blaszczak waited almost a day to provide Deerfield – his most important client (GX 1807; Epple Tr. 2549) – information on one of Fogel's "favorite topics."

*Fifth*, Fogel's description of his call with Blaszczak during which the latter provided the radiation oncology information also included a discussion of a variety of other topics, all of which have two things in common – they relate to HAPG and there is no evidence that Worrall had knowledge of any of them.  (GX 806).  These topics include: a discussion relating to Niles Rosen, whose principal contact at CMS was Hauswald, the HAPG team member who presented at the May 8 HCPCS meeting (Rosen Tr. 1911-12); and information about the clinical lab fee schedule, for which "HAPG and the Division of Ambulatory Services specifically is responsible."  (Bassano Tr. 2015-16).  It is more than a reasonable inference that Blaszczak learned about all these HAPG topics from the same person at the same time and the evidence is

entirely inconsistent with Worrall, who knew nothing about any of these matters, being that person.

*Sixth*, Blaszczak provided updates on the HAPG topics referenced in Fogel's May 9 email to Deerfield between May 9, the day after he met with Worrall, and June 22, when he saw Worrall again.  (GX 813, GX 819, GX 831, GX 850).  However, not only is there is no evidence that Worrall and Blaszczak met or spoke during the intervening period – despite the government's collection of call records, personal and work emails, and CMS sign-in sheets, among other documents (GX 3010) – the updates actually reference the individuals from whom Blaszczak received information, none of whom is Worrall.  On May 21, 2012, Fogel provided an update from Blaszczak on radiation oncology and also noted that Blaszczak had spoken with "CMS people" about aortic valve replacement codes, (GX 813), a subject about which there is no evidence Worrall knew anything.  On June 6, 2012 (the day after Blaszczak attended another HCPCS meeting at CMS during which there is no evidence that he saw Worrall, (GX 438, GX 1655, GX 3010, Shimko Tr. 2806)), Huber reported updated information on radiation oncology from Blaszczak and also noted that Blaszczak had met with "senior CMS people," a description that does not fit Worrall.  (GX 819).  On June 11, 2012, Huber again reported information about radiation oncology from Blaszczak; in that same document, Huber also referenced new information that Blaszczak received about the clinical lab fee schedule from the "#2 in payment at CMS," (GX 831), a title that fits Hartstein (as the second-in-command of HAPG, one of CMS's payment groups) but does not fit Worrall.  (Bassano Tr. 2002).

*Seventh*, while Blaszczak and Worrall did see each other at least briefly on June 22 when Blaszczak visited CMS, Blaszczak learned nothing about radiation oncology (meaning that the only contact with Worrall that precedes a time when Blaszczak had new information on the

radiation oncology rule was May 8).  (GX 845).  Thereafter, Blaszczak received yet another update from an individual other than Worrall (with whom there is no evidence Blaszczak had contact between June 22 and the rule's release on July 6): on June 29, 2012, Huber wrote to Deerfield colleagues that he had learned from Blaszczak that there had been a June 27 meeting "between OMB and senior staff at CMS" and that "Rad Onc was not on the agenda" which led Blaszczak to believe it was "on track."  (GX 850).  Testimony at trial established that Worrall never attended any OMB meetings, (Bassano Tr. 2011-13), and there is no contradictory documentary evidence that Worrall was ever invited to, attended or received any documents relating to any OMB meeting.  To state the obvious, Blaszczak's receipt of information from sources other than Worrall about the radiation oncology rule and other HAPG topics on dates subsequent to May 9 – during periods when he had no contact with Worrall – renders the inference that Blaszczak received the May 9 information from Worrall much less reasonable than it might at first appear.

*Eighth*, the government introduced evidence that it argued showed that Blaszczak received information about 2009 radiation oncology and ESRD proposed rules.  (GX 534, GX 555).  There was no evidence that Worrall – who worked on Medicare insurance issues at the time – had or passed on any information regarding these rules (nor did the government argue that he did).  (Blum Tr. 227, 362, 387; Bassano Tr. 1999).  Again, the evidence that someone other than Worrall provided Blaszczak with information about a proposed radiation oncology rule in 2009 is inconsistent with an inference that Worrall – rather than the unidentified source of the earlier information – provided the 2012 proposed rule to Blaszczak.

In sum, the evidence looked at in whole eviscerates any superficial inference that might be drawn from the fact that Worrall and Blaszczak met on May 8 and Blaszczak provided

information on the proposed radiation oncology rule to Fogel on May 9.  That evidence is at least

as – and in fact far more – consistent with that information having been provided by one or more

people other than Worrall, even presuming there was evidence that Worrall had it in the first

place.[5]

### III.  THE TESTIMONY OF THE GOVERNMENT'S COOPERATING WITNESS DOES NOT SUPPORT THE INFERENCE THAT WORRALL WAS THE SOURCE FOR THE 2012 RADIATION ONCOLOGY RULE

The government relied on two cooperating witnesses – Marc Samuels and Tim Epple – to

attempt to establish that Worrall was one of Blaszczak's sources of confidential CMS

information (the government's other cooperators, Fogel and Chris Plaford, did not utter

Worrall's name; in fact, the government acknowledged that Blaszczak's source for information

provided to Plaford regarding the 2013 home health rule was someone other than Worrall.

(Govt. Closing Tr. 3568)).  However, Samuels's and Epple's testimony does not support the

inference that Worrall was the source of the 2012 radiation oncology rule.  Most obviously,

neither Samuels nor Epple even mentioned the rule in their testimony.  Beyond that, their

testimony was vague and – on cross-examination – proved essentially worthless.  While Samuels

testified on direct that "Worrall provided Mr. Blaszczak with confidential information" (Samuels

---

[5] The jury rejected the idea that Worrall was part of a systematic attempt to illicitly extract information from CMS, acquitting him of all the conspiracy counts and the substantive counts relating to matters other than the 2012 radiation oncology rule (which, as detailed above, related at most to a single interaction between Worrall and Blaszczak).  In doing so, the jury also rejected the idea that Worrall got anything out of the alleged scheme, which is why his co-defendants were acquitted of Title 15 securities fraud but convicted of Title 18 securities fraud which the Court's charge indicated does not require a benefit to the source of the information. (Jury Charge Tr. 3971-72).  The acquittals are relevant to the Court's assessment of the reasonableness of jury's verdict with respect to Counts 3 and 9; because there is no suggestion in the jury's verdict that they believed there to be any sort of pattern or practice of improper interactions between Worrall and Blaszczak – or any motive for Worrall to provide the information – the strength of any inference that Blaszczak's information on May 9 resulted from their interaction on May 8 is further diminished.

Tr. 1536-37), on cross he conceded that the single piece of confidential information that he understood came from Worrall was a 2013 slide deck that in substance had been made public prior to its receipt by Blaszczak and which related to ESRD (as to which Worrall was acquitted on all relevant counts).  (Samuels Tr. 1702).  In fact, Samuels's correspondence introduced at trial involving Worrall showed that – despite Samuels's best efforts to get information from Worrall through Blaszczak – Worrall did not provide any information, which Samuels acknowledged in his testimony.  (Samuels Tr. 1712, 1717-18).

If possible, Epple's testimony was less persuasive.  Epple – who did not begin working for Blaszczak until after 2012, the relevant year for the radiation oncology rule – generally testified on direct that he understood that Worrall was a source for Blaszczak (Epple Tr. 2521, 2556); but on cross he agreed that Blaszczak had described Worrall as a friend whom Blaszczak saw from time-to-time and acknowledged that he had no basis for knowing of even one piece of information that Blaszczak had obtained from Worrall.  (Epple Tr. 2676-77).  Epple, like Samuels, also testified that Blaszczak had many contacts at CMS, including within HAPG, and that Blaszczak went to meetings and trolled the halls looking for CMS employees to talk with. (Epple Tr. 2675; Samuels Tr. 1693-94).

The bottom line is that any argument that Samuels's and Epple's testimony shows Worrall was generally a source of information, rendering it more likely he was the source of information with respect to the 2012 radiation oncology rule, is undermined by any even casual evaluation of the testimony itself.  It would be unreasonable to believe (much less beyond a reasonable doubt) that Worrall was a source of illicit information on radiation oncology based on the testimony of two individuals who, between them, could only cite a single document that allegedly came from Worrall that was about a different topic in a different year and contained

public information, and whose testimony concerning Blaszczak's other sources of information and Worrall's refusal to provide the one piece of evidence Samuels affirmatively attempted to obtain was more consistent with Worrall's innocence than with his guilt.

## CONCLUSION

Courts disfavor usurping the jury's role in weighing the evidence and determining whether it is sufficient to conclude that a defendant is guilty beyond a reasonable doubt. In part for that reason, while sufficiency motions are frequently made, they are less frequently granted. This is one of those relatively rare cases in which justice requires that this Court put aside the jury's verdict as to Worrall. *See Guadagna*, 183 F.3d at 130. The evidence does more than "give[] equal or nearly equal circumstantial support" to a "theory of innocence," *Cassese*, 428 F.3d at 99; it gives that "theory" far greater support. Because no reasonable jury could have found Worrall guilty beyond a reasonable doubt, *Guadagna*, 183 F.3d at 130, Worrall's motion for a judgment of acquittal on Counts 3 and 9 should be granted.

Dated:  New York, New York
        June 8, 2018

                                Respectfully submitted,

                                SHEARMAN & STERLING LLP

                                   s/ Stephen Fishbein
                                Stephen Fishbein
                                John A. Nathanson
                                599 Lexington Avenue
                                New York, NY 10022-6069
                                Telephone:     212-848-4424/8611
                                Facsimile:      646-848-4424/8611
                                Email:  sfishbein@shearman.com
                                        john.nathanson@shearman.com

                                *Attorneys for Defendant Christopher Worrall*

15