UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                              :

   UNITED STATES OF AMERICA     :
                              :

        - v. -             :           S1 17 Cr. 357 (LAK)
                              :

   DAVID BLASZCZAK,         :
   THEODORE HUBER,         :
   ROBERT OLAN and         :
   CHRISTOPHER WORRALL,   :
                              :

         Defendants.      :
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

# GOVERNMENT'S OPPOSITION TO
# DEFENDANTS' POST-TRIAL MOTIONS

ROBERT KHUZAMI
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

Ian McGinley
Joshua A. Naftalis
Assistant United States Attorneys
    - Of Counsel-

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................... 1

  A.  The Indictment ........................................................................................................... 1

  B.  The Government's Case ............................................................................................. 3

      1.   Relevant Parties and Entities ............................................................................ 3

          a.  CMS ............................................................................................................ 3

          b.  Christopher Worrall ................................................................................... 5

          c.  David Blaszczak ........................................................................................ 6

          d.  Deerfield, Huber, Olan, and Fogel ........................................................... 7

          e.  Visium and Christopher Plaford ................................................................ 8

      2.   The Scheme to Convert and Use Confidential CMS Information Involving Deerfield... 9

          a.  Dr. Niles Rosen ....................................................................................... 11

          b.  July 6, 2012 Proposed Radiation Oncology Rule ................................... 12

          c.  July 1, 2013 Proposed End Stage Renal Disease Rule ........................... 14

          d.  Deerfield's "Cancellation" and Continued Use of Blaszczak ................. 155

      3.   The Scheme to Convert and Use Confidential CMS Information Involving Visium .... 16

  C.  The Defendants' Case ............................................................................................ 18

  D.  The Government's Rebuttal Case ........................................................................... 18

  E.  The Verdict ............................................................................................................ 18

  F.  The Defendants' Rule 29 and Rule 33 Motions .................................................... 19

ARGUMENT ..................................................................................................................... 21

POINT I: APPLICABLE LAW .......................................................................................... 21

  A.  Rule 29 .................................................................................................................. 21

B.    Rule 33 ............................................................................................................... 23

POINT II: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY
TO CONCLUDE THAT HUBER AND OLAN CONVERTED GOVERNMENT
PROPERTY ....................................................................................................................... 24

A.    The Evidence Demonstrated that Huber and Olan Appreciated that Blaszczak's
Disclosure of CMS Confidential Information Was Prohibited .......................... 24

B.    The Evidence Showed that the Conversion of Confidential CMS Information Seriously
Interfered with the Government's Right to Use and Control Its Own Property .............. 27

POINT III: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY
TO CONCLUDE THAT HUBER AND OLAN CONSPIRED TO DEFRAUD THE UNITED
STATES ............................................................................................................................. 28

POINT IV: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE
JURY TO CONCLUDE THAT HUBER AND OLAN COMMITTED WIRE FRAUD AND
TITLE 18 SECURITIES FRAUD ..................................................................................... 30

A.    A "Personal Benefit" is Not Required Under the Wire Fraud or Title 18 Securities Fraud
Statutes ............................................................................................................... 31

B.    CMS's Confidential Information is "Property" Under the Wire Fraud and Title 18
Securities Fraud Statutes ................................................................................... 33

POINT V: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY
TO CONCLUDE THAT HUBER AND OLAN COMMITTED THE MULTI-OBJECT TITLE
371 CONSPIRACY ........................................................................................................... 38

POINT VI: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE
JURY TO CONCLUDE THAT BLASZCZAK IMPROPERLY OBTAINED CONFIDENTIAL
CMS INFORMATION ...................................................................................................... 40

POINT VII: THE COURT PROPERLY ADMITTED WORRALL'S STATEMENTS TO LAW
ENFORCEMENT PURSUANT TO BRUTON .................................................................. 43

POINT VIII: THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE
JURY TO CONCLUDE THAT WORRALL CONVERTED GOVERNMENT PROPERTY
AND COMMITTED WIRE FRAUD ................................................................................. 51

CONCLUSION .................................................................................................................. 56

# TABLE OF AUTHORITIES

*Board of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U.S. 236 (1905)........................ 35

*Carpenter* v. *United States*, 484 U.S. 19 (1987) ......................................................... 31

*Cleveland* v. *United States*, 531 U.S. 2 (2000) .......................................................... 36

*Gray* v. *Maryland*, 523 U.S. 185 (1998) ................................................................. 48

*Jackson* v. *Virginia*, 443 U.S. 307 (1979)............................................................... 21

*Richardson* v. *Marsh*, 481 U.S. 200 (1987)............................................................. 48

*Romero* v. *United States*, 28 F.3d 267 (2d Cir. 1994) ................................................. 23

*Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986 (1984) ................................................... 35

*Schneble* v. *Florida,* 405 U.S. 427 (1972) .............................................................. 48

*SEC* v. *Obus*, 693 F.3d 276 (2d Cir. 2012) .............................................................. 40

*SEC* v. *Warde*, 151 F.3d 42 (2d Cir. 1998) .............................................................. 39

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)........................................... 22, 52

*United States* v. *Benitez*, 920 F.2d 1080 (2d Cir. 1990) .............................................. 49

*United States* v. *Carpenter*, 484 U.S. 19 (1987)................................................... 34, 37

*United States* v. *Chestman*, 947 F.2d 551 (2d Cir. 1991) ............................................ 32

*United States* v. *Chow*, 17 Cr. 667 (GHW) (S.D.N.Y. Apr. 20, 2018)............................ 33

*United States* v. *Cleveland*, 531 U.S. 12 (2000) ....................................................... 33

*United States* v. *Crowley*, 318 F.3d 401 (2d Cir. 2003).............................................. 21

*United States* v. *Czubinski*, 106 F.3d 1069 (1st Cir. 1997)......................................... 37

*United States* v. *Eppolito*, 543 F.3d 25 (2d Cir. 2008) .............................................. 22

*United States* v. *Espaillet*, 380 F.3d 713 (2d Cir. 2004)........................................ 21, 52

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001)............................................ 23

*United States* v. *Fowler*, 932 F.2d 306 (4th Cir. 1991) ................................................... 37

*United States* v. *Gambino*, 59 F.3d 353 (2d Cir. 1995) ................................................ 23

*United States* v. *Grossman*, 843 F.2d 78 (2d Cir. 1988) ............................................... 35

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) ........................................ 21, 22

*United States* v. *Gurary*, 860 F.2d 521 (2d Cir. 521) ................................................. 29

*United States* v. *James*, 239 F.3d 120 (2d Cir. 2000) .............................................. 22

*United States* v. *Jass*, 569 F.3d 47 (2d Cir. 2009) ...................................................... 48

*United States* v. *Kernell,* 2010 U.S. Dist. LEXIS 36477 (E.D. Tenn. 2010) .............................. 38

*United States* v. *Kirsh,* 54 F.3d 1062 (2d Cir.1995) ................................................... 49

*United States* v. *Kozeny*, 667 F.3d 122 (2d Cir. 2011) .......................................... 21, 22

*United States* v. *Kyles*, 40 F.3d 519 (2d Cir. 1994) ................................................ 49

*United States* v. *Lambert*, 446 F. Supp. 890 (D. Conn. 1978) ..................................... 24

*United States* v. *Lee*, 723 F.3d 134 (2d Cir. 2013) ................................................... 21

*United States* v. *Mahaffy*, 2006 WL 2224518 (E.D.N.Y. Aug 2, 2016) ...................................... 32

*United States* v. *Mahaffy*, 499 F. Supp. 2d 291 (E.D.N.Y. 2007) .................................... 54

*United States* v. *Martin*, 228 F.3d 1 (1st Cir. 2000) ................................................. 35

*United States* v. *Martoma*, 2017 WL 9620394 (2d. Cir. June 25, 2018) ................................. 39

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001) ............................................. 23

*United States* v. *McFarlane*, 198 F. App'x 56 (2d Cir. Aug. 30, 2006) ...................................... 33

*United States* v. *Melvin*, 143 F. Sup. 3d 1354 (N.D. Ga. 2015) ............................................ 32, 34

*United States* v. *Mi Sun Cho*, 713 F.3d 716 (2d Cir. 2013) ........................................ 21, 55

*United States* v. *Middendorf*, 18 Cr. 36 (JPO) (S.D.N.Y. 2018) ................................... 34

*United States* v. *Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009) ...................................... 32

*United States* v. *Nurse*, 205 F.3d 1326 (2d Cir. 2000)..................................................... 34

*United States* v. *Ogando*, 547 F.3d 102 (2d Cir. 2008) ................................................... 22

*United States* v. *Peltz*, 433 F.2d 48 (2d Cir. 1970) ........................................................ 28

*United States* v. *Persico*, 645 F.3d 85 (2d Cir. 2011) ................................................ 21, 22

*United States* v. *Rafatnejad*, 18 Cr. 94 (JMF) (S.D.N.Y.) ........................................... 38

*United States* v. *Salman*, 137 S. Ct. 420 (2016) .......................................................... 39

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .............................................. 23

*United States* v. *Seidlitz*, 589 F.2d 152 (4th Cir. 1978) ............................................... 35

*United States* v. *Sisca*, 503 F.2d 1337 (2d Cir. 1974)) ................................................ 34

*United States* v. *Slawson*, 2014 WL 5804191 (N.D. Ga. Nov. 7, 2014)....................... 32

*United States* v. *Southland Corp.*, 760 F.2d 1366 (2d Cir. 1985)................................. 29

*United States* v. *Temple*, 447 F.3d 130 (2d Cir. 2006) .................................... 21, 22, 23

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989)................................................. 48

*United States* v. *Ulloa*, 882 F.2d 41 (2d Cir.1989) ...................................................... 34

*United States* v. *Wang*, 898 F. Supp. 758 (D. Col. 1995) ............................................ 35

*United States* v. *Whab*, 355 F.3d 155 (2d Cir. 2004)................................................... 25

*United States* v. *Wilkinson*, 754 F.2d 1427 (2d Cir. 1985) .......................................... 48

*United States* v. *Williams*, 936 F.2d 698 (2d Cir. 1991)......................................... 48, 49

*United States* v. *Willis*, 737 F. Supp. 269 (S.D.N.Y. 1990) ......................................... 35

*United States* v. *Zayac*, 765 F.3d 112 (2d Cir. 2014) ............................................. 22, 53

The Government respectfully submits this memorandum of law in opposition to defendants David Blaszczak's, Theodore Huber's, Robert Olan's, and Christopher Worrall's motions for judgments of acquittal and new trials pursuant to Federal Rules of Criminal Procedure 29 and 33.  (Dkt. 251, 350, 351.)  As set forth below, the trial evidence, viewed in the light most favorable to the Government and with all inferences drawn in the Government's favor, provided more than a sufficient basis for a rational jury to conclude that the defendants were guilty beyond a reasonable doubt on each of the counts of conviction.  The defendants' arguments in support of a new trial are equally without merit.  Accordingly, the motions should be denied.

## BACKGROUND

### A.    The Indictment

On March 5, 2018, a federal grand jury in the Southern District of New York returned Superseding Indictment S1 17 Cr. 357 (LAK) (the "Indictment") charging defendant David Blaszczak, a so-called "political intelligence" consultant; defendants Theodore Huber and Robert Olan, two partners and analysts at Deerfield Management Company, L.P., a healthcare-focused hedge fund based in New York ("Deerfield"); and defendant Christopher Worrall, a federal government employee at the Centers for Medicare and Medicaid Services ("CMS"), in eighteen counts.[1]  (Dkt. 137.)

The Indictment charged two related and overlapping schemes to illegally obtain and utilize confidential, nonpublic government information to make profitable trades in the stock market.  The first sixteen counts of the Indictment related to an effort by the defendants, from in or about 2009 through in or about 2014, to obtain material, nonpublic information from CMS and use it for, among other things, executing profitable securities trades at Deerfield.  For their

---

[1]    Indictment 17 Cr. 358 (LAK) was returned on May 24, 2017.  (Dkt 10.)

participation in this scheme, all defendants were charged with:  (1) conspiracy to (a) convert property of the United States, (b) commit Title 15 securities fraud, and (c) defraud the United States, in violation of 18 U.S.C. § 371 (Count One); (2) conspiracy to commit (a) wire fraud and (b) Title 18 securities fraud, in violation of 18 U.S.C. § 1349 (Count Two); (3) conversion of property of the United States, in violation of 18 U.S.C. §§ 641 and 2 (Count Three); (4) Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240-10b-5, and 18 U.S.C. § 2 (Counts Four through Eight); (5) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Nine); and (6) Title 18 securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Count Ten). Blaszczak and Worrall were charged with additional counts of certain of these offenses, specifically:  (7) conversion of property of the United States, in violation of 18 U.S.C. §§ 641 and 2 (Counts Eleven and Thirteen); (8) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Twelve and Fifteen); (9) Title 15 securities fraud, in violation of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240-10b-5, and 18 U.S.C. § 2 (Count Fourteen); and (10) Title 18 securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Count Sixteen).

The final two counts of the Indictment charged Blaszczak only with obtaining confidential and nonpublic CMS information about cuts in CMS's reimbursement rates for home health providers, and providing that information to Christopher Plaford, a portfolio manager at Visium Asset Management, L.P., a second healthcare-focused hedge fund based in New York ("Visium"), from at least in or about 2011 through at least in or about 2013.  Plaford used the nonpublic CMS information he received from Blaszczak to execute profitable trades at Visium. For his participation in this scheme, Blaszczak was charged with:  (11) conspiracy to (a) defraud the United States and (b) convert the property of the United States, in violation of 18 U.S.C. § 371

(Count Seventeen); and (12) conversion of property of the United States, in violation of 18 U.S.C. §§ 641 and 2 (Count Eighteen).

### B.     The Government's Case

During the course of the four-and-half-week trial of this matter, which took place from April 2, 2018 through May 3, 2018, the Government called 15 witnesses and introduced 664 exhibits, in its direct and rebuttal cases.   The evidence adduced by the Government at trial established the following.

### 1.     Relevant Parties and Entities

#### a.     CMS

CMS is the federal agency within the United States Department of Health and Human Services ("HHS") that administers Medicare and Medicaid.  (Tr. 193-94 (Blum); Tr. 1165 (Fogel).)  CMS spends more than $1 trillion per year on healthcare benefits and grants to states. (Tr. 195 (Blum).)   One of CMS's primary responsibilities is to establish annually the reimbursement rates that Medicare pays to healthcare providers, such as doctors, hospitals, and nursing homes.  (Tr. 193-97 (Blum); Tr. 1165 (Fogel).)  These reimbursement rates are "significant rules" and generally follow a notice and comment procedure — with CMS publicly announcing a proposed rule, followed by a 60-day comment period before the final rule is publicly announced. (Tr. 197, 257 (Blum); Tr. 1923 (Bassano).)   Proposed rules and final rules are first publicly "displayed" on the CMS website before their formal printing in the Federal Register.  (Tr. 258 (Blum).)

CMS keeps its "predecisional" information — CMS's internal consideration of proposed and final rules — confidential until the agency publicly announces its proposed and final rules.  (Tr. 198 (Blum); Tr. 1924-29 (Bassano); Tr. 1540 (Samuels).)  CMS generally makes these

announcements at around 4:15 p.m., after the stock market is closed.  (Tr. 199 Blum); Tr. 2379 (Hartstein); Tr. 2662 (Epple).)  CMS does so because its decisions are market sensitive and can affect the stock prices of publicly-traded companies that are impacted by CMS decisions.  (Tr. 199 (Blum); Tr. 1927 (Bassano); Tr. 2379 (Hartstein).)  CMS also keeps its predecisional thinking confidential to ensure that the public has an "equal" and "fair" opportunity to digest CMS's announcements.  (Tr. 197-99 (Blum); Tr. 1926-27 (Hartstein).)  CMS does not share predecisional information about proposed or final rules with Congress or its staff.  (Tr. 1935-36 (Bassano).)

   If predecisional information is improperly leaked or stolen, it negatively affects CMS in carrying out its regulatory responsibilities.  The theft of such information leads to a "tighten[ing]" of CMS's internal information sharing process, which can lead to the agency making "mistakes" and "not fully vetting . . . [its] options" in proposing rules and policies.  (Tr. 1932-33 (Bassano).)  Moreover, the leak of predecisional CMS information can undermine the agency's regulatory deliberative process, resulting in premature lobbying by interest groups outside of the required notice and comment period that can affect what rules CMS announces.  (Tr. 209-10 (Blum:  "CMS's rule-making process . . . [is] designed to be fair to all stakeholders, to make sure that everybody has the right to comment at the same time. . . . [W]hen . . . predecisional materials get leaked, that . . . begins to trigger lobbying, begins to trigger powerful forces to try and stop decisions.  So, when leaks happen, my job became more tough and more difficult to manage the process flow and to convince my superiors of the right course for the Medicare program.").)  This improper lobbying can result in "suboptimal" healthcare policy and undermines CMS's mission of providing its beneficiaries with the highest level of healthcare.  (Tr. 1932-33 (Bassano); Tr. 2378-79 (Hartstein:  "That harm could be that it could create opposition to the policies that CMS was trying to adopt."); Tr. 360-61 (Blum: "if the process was violated, and if

- 4 -

there was a perception that the process wasn't fair, that would damage the agency and make it much more difficult to sustain very controversial decisions").)

All CMS employees are trained on CMS's confidentiality policy on an annual basis. (Tr. 198-99 (Blum); Tr. 1929-32 (Bassano).)  CMS's Employee Nondisclosure Policy prohibited employees from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law."  (Tr. 1929-30 (Bassano); GX 1222; DX 9.)  This policy explained that information learned in the course of CMS employment, such as "an announced change in CMS payment or coverage policy," could be "'market sensitive' information, meaning that its disclosure may have stock or bond market implications."  (GX 1222.)  Moreover, federal regulation provides that a CMS employee, like all employees of the executive branch, "shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, by knowing unauthorized disclosure."  *Standards of Ethical Conduct for Employees of the Executive Branch*, 5 C.F.R. § 2635.703 (GX 2206) (cited in GX 1222).)  Under this regulation, nonpublic information "is information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the general public.  It includes information that he knows or reasonably should know . . . [i]s designated as confidential by an agency."  (GX 2206.)

b.      **Christopher Worrall**

Worrall began working at CMS in or about 1999.  (Tr. 2328 (Moore).)  Beginning in approximately 2010, Worrall began to work in the Director's Office for the Center for Medicare ("CM"), the part of CMS responsible for establishing Medicare payment rates.  (DX 113; Tr. 196 (Blum).)  Worrall focused on analyzing Medicare claims data.  Between approximately 2012 and

2014, he was a Senior Technical Advisor to Jon Blum, the Director of the CM.  (Tr. 372 (Blum); Tr. 1984 (Bassano); GX 1337.)   Worrall also served as a project manager for a confidential, nonpublic CMS database that contained CMS's most up-to-date claims data that CMS used to inform its decision-making.  (Tr. 231, 300-01 (Blum); Tr. 2018-20 (Bassano); Tr. 2330 (Moore).)   Because of his role, Worrall attended briefings during which proposed and final rules covering a broad range of policies were discussed with the Director of the CM and other senior CMS officials.  (Tr. 1985, 2115 (Bassano); Tr. 2419 (Hartstein).)   Worrall admitted to federal agents that he "coordinated and communicated with many people within the agency and had his hand in a lot of data . . . that he had his hands in everything" at CMS.  (Tr. 2328 (Moore).)   Given his position, it was not "unusual" for Worrall to discuss predecisional information, including upcoming proposed or final rules, with other senior CMS officials.  (Tr. 1986 (Bassano).)

### c.   David Blaszczak

Blaszczak worked as a consultant at a number of Washington, D.C.-based firms that sold so-called "political intelligence" to clients.  This information included predictions about upcoming CMS reimbursement rates and how those changes would impact publicly-traded companies in the healthcare space.  (Tr. 253 (Blum); Tr. 679 (Fogel); Tr. 1761 (Plaford); Tr. 1976 (Bassano).)  Before becoming a political intelligence consultant, Blaszczak worked at CMS with Worrall.  (Tr. 1786-87 (Plaford); Tr. 2331 (Moore).)  Blaszczak often based his predictions, in whole or in part, on information that he learned from current employees at CMS.  (Tr. 646 (Fogel: Blaszczak said he got nonpublic, predecisional information "[p]rimarily from CMS"); Tr. 1762 (Plaford: Blaszczak said he got nonpublic, predecisional information "[f]rom his contacts who were still within — still worked at CMS"); Tr. 1790 (Plaford:  Blaszczak said he received nonpublic predecisional information "directly from his contacts within CMS that were working on

that specific regulation"); Tr. 2521 (Epple: Blaszczak obtained nonpublic, predecisional information from his sources at CMS, including Worrall).  While Blaszczak would sometimes "wander the halls" at CMS to pick up information, Worrall was his primary source within CMS. (Tr. 2521, 2675 (Epple).)  Worrall and Blaszczak were close friends, dating back to their time working together at CMS, and they socialized regularly.  (Tr. 1786-87 (Plaford); Tr. 2331 (Moore); Tr. 2521, 2556-57 (Epple).)   Worrall and Blaszczak often discussed Blaszczak helping Worrall get a high-paying private sector job.  (GX 350-K, 1248, 1249, 1251; Tr. 1546-54 (Samuels).)

Blaszczak's principal clients were hedge funds, including Deerfield and Visium. (Tr. 2548 (Epple); GX 1807.)  With respect to at least these two funds, they hired Blaszczak because of his access to CMS employees who provided him with nonpublic CMS information. (Tr. 1467-68 (Fogel); Tr. 1790-92 (Plaford).)  During the scheme, Deerfield paid hundreds of thousands of dollars in consulting fees to various firms that employed Blaszczak.  (Tr. 647, 1452 (Fogel).)  At times, Deerfield paid Blaszczak bonuses for providing actionable and profitable inside information.  (Tr. 781-82, 817, (Fogel); Tr. 2551 (Epple); Tr. 3287-88 (Brancaccio).) Visium also paid Blaszczak for his services.  (Tr. 1764.)

### d.    Deerfield, Huber, Olan, and Fogel

Deerfield managed multiple hedge funds specializing in healthcare-related investments. (Tr. 643 (Fogel).)  As of 2017, Deerfield had more than $7 billion in assets under management.  (Tr. 674 (Fogel).)  Huber and Olan were partners and analysts at Deerfield who focused on medical devices.   (Tr. 666 (Fogel).)  Between approximately 2006 and January 2013, Huber and Olan worked on a team with a third analyst, Jorden Fogel.  (Tr. 671, 1469, 1492 (Fogel).) Fogel pled guilty, pursuant to a cooperation agreement, for his role in the charged scheme and testified at trial.  (Tr. 642-1521 (Fogel).)  At Deerfield, Huber, Olan, and Fogel worked

together analyzing medical device companies and making trading recommendations to James Flynn, Deerfield's managing partner, who was ultimately responsible for approving trades. (Tr. 668, 672 (Fogel); Tr. 2229 (Clark).) As per policy implemented by Flynn, Huber, Olan, and Fogel generally had to reach consensus before recommending trades to Flynn for approval. (Tr. 1482-83 (Fogel).) In January 2013, Fogel moved to another team at Deerfield that focused on medical services companies. (Tr. 671, 786 (Fogel).) Huber, Olan, and Fogel were the primary Deerfield analysts and partners who used Blaszczak as a consultant. (Tr. 2548; GX 1807.)

Deerfield charged its investors a management fee (calculated as a percentage of the assets under management) and performance fee (calculated a percentage of the profits). (Tr. 2959 (Flynn).) As managing partner, Flynn was entitled to all of Deerfield's profits and he allocated those profits to each of the firm's partners, including Huber, Olan, and Fogel, in his sole discretion. (Tr. 2973 (Flynn).) Flynn considered a number of factors in allocating profits to Deerfield's partners, including a partner's ability to generate illegal "edge" — *i.e.*, material nonpublic information. (Tr. 670-71 (Fogel: "The most important factor was the ability to find and create an edge or investment advantage."); Tr. 737-38 (Fogel).) Between 2009 and 2014, Olan earned approximately $58 million in salary, bonus, and profit participation at Deerfield; Huber earned approximately $51 million in salary, bonus, and profit participation at Deerfield; and Flynn earned approximately $200 million in profit participation (as general partner he did not receive a salary). (GX 993-1024.)

e.     **Visium and Christopher Plaford**

Visium was also a multi-billion dollar investment manager that managed various hedge funds specializing in healthcare-related investments. (Tr. 1760 (Plaford).) Christopher Plaford was a partner and portfolio manager at Visium. (Tr. 1760 (Plaford).) Plaford pled

guilty, pursuant to a cooperation agreement, and testified for the Government at trial.  (Tr. 1759-1886 (Plaford).)  Plaford used Blaszczak as a political intelligence consultant, and he was one of Blaszczak's primary contacts at Visium.  (Tr. 1761 (Plaford); Tr. 2548 (Epple).)  Plaford testified that Blaszczak was the only political intelligence consultant he knew who had access to sources inside CMS, and the only political intelligence consultant who provided him with nonpublic, predecisional information.  (Tr. 1792-93 (Plaford).)

Visium charged its investors a management fee and a performance fee.  (Tr. 1782-83 (Plaford).)  Plaford's compensation was set by the chief investment officer of Visium, Jacob Gottlieb.  (Tr. 1783 (Plaford).)  Plaford's compensation was based on his personal performance and Visium's overall performance.  (Tr. 1783-84 (Plaford).)  Plaford made millions of dollars during his time working at Visium.  (Tr. 1785 (Plaford).)

### 2. The Scheme to Convert and Use Confidential CMS Information Involving Deerfield

From at least in or about 2009 through in or about 2014, the defendants and others participated in a scheme to convert to their own use confidential and nonpublic information from CMS concerning, among other things, CMS's internal deliberations regarding upcoming reimbursement decisions.  Blaszczak provided Huber, Olan, and Fogel with confidential CMS reimbursement decisions, down to the "specific" reimbursement rates, before they were publicly announced, as well as a "play by play" of the policy and rate changes that CMS was discussing internally.  (Tr. 680, 847, 1454, 1467-68 (Fogel); Tr. 2520-21 (Epple).)  At times, he also provided draft language from CMS regulations and CMS presentations.  (Tr. 853 (Fogel); GX 554, 1070, 1406, 1508.)

Huber, Olan, Fogel, and others at Deerfield used the confidential and nonpublic CMS information they received from Blaszczak to execute trades in healthcare stocks that would

be affected by upcoming CMS reimbursement decisions.  (Tr. 645-46, 1467-68, 1495 (Fogel); Tr. 2520-21 (Epple).)  Between 2009 and 2013, Deerfield made approximately $7.1 million in illegal profits trading on confidential CMS information that Blaszczak provided.  (Tr. 615 (Taveras); GX 3000.)  Blaszczak told Huber, Olan, and Fogel that the nonpublic information he was providing had been obtained from inside CMS, and they understood that Blaszczak was not obtaining the information from public sources.  (Tr. 680, 737-38, 750, 767, 790-92, 796, 869, 881, 1467-68, 1476 (Fogel); GX 510 (Huber:  Blaszczak has a "unique flow of info"); GX 1065 (Huber:  Blazack [sic] . . . is way better plugged into CMS"); GX 786 (Olan:  So what is public info (Blaszak [sic] in print on) and what do we have in our back pocket?").)  Indeed, a December 2007 email from Alexander Karnal, Deerfield's head trader, to Flynn summarizing a morning meeting at Deerfield at which investment ideas were discussed stated explicitly:  "Blazacks [sic] comments pre-news suggest he had a read of draft documents . . . Street expects 15% cuts[.] Blazack [sic] calling for 33% cuts."  (GX 1070.)

      Over the years, Blaszczak provided Huber, Olan, and Fogel with "dozens" of pieces of confidential CMS information.  (Tr. 647 (Fogel).)  This confidential CMS information gave Deerfield an illegal "edge" in the market that Huber, Olan, and Fogel used to execute profitable securities trades.  (Tr. 904, 912 (Fogel).)  Huber, Olan, and Fogel used Blaszczak because he was "able to get information other D.C. analysts couldn't."  (Tr. 1467-68 (Fogel).)  No other political intelligence analyst was able to provide Huber, Olan, and Fogel with as "much nonpublic information from CMS" as Blaszczak.  (Tr. 909-10, 917 (Fogel); GX 926.)

      According to Marc Samuels, Blaszczak's partner, and Tim Epple, Blaszczak's research analyst, Blaszczak's main sources of nonpublic CMS information was Worrall.  (Tr. 1529 (Samuels); Tr. 2521 (Epple); GX 1400 (Blaszczak email to Samuels:  "[Worrall] knows a ton [sic]

what's going on at cms")).  Blaszczak also bragged to Ruth Hoffman, an unindicted co-conspirator who worked at Amgen, that his "friend Chris got promoted at CMS. . . . [He] basically covers [Parts] A, B, C, and of CMS.  That is the best job ever at CMS — since he has his hands in all areas!"  (GX 1705.)  Hoffman replied, "Great on your well placed source!!"  (GX 1705; *see also* GX 1511 (Hoffman:  "I have to protect Dave's source.").  In October 2014, the *Wall Street Journal* published an article reporting that the SEC was investigating Blaszczak.  (Tr. 2582 (Epple).)  After the article came out, Blaszczak called Worrall to see if anyone at CMS at been approached by the SEC or asked about Blaszczak.  (Tr. 2582-83 (Epple).)  Blaszczak also told Worrall, "We'd kill it working together."  (GX 350-K.)  Worrall responded, "You're like a drunk whore to me.  Hard to resist.  Lol.  Let's talk."  (GX 350-K.)

### a. Dr. Niles Rosen

In 2012, Huber, Olan, and Fogel tasked Blaszczak with trying to obtain confidential CMS-related information from Dr. Niles Rosen about genetic testing.  (Tr. 727-37 (Fogel); *see also* Tr. 1896-99 (Rosen); GX 1611, 1612.)  Rosen, a CMS contractor, worked as the medical director at the National Correct Coding Initiative ("NCCI"), a program designed to prevent incorrect payment by Medicare and Medicaid for services performed by healthcare providers.  (Tr. 1891-92 (Rosen).)  Rosen's work at NCCI and his recommendations to CMS about changes to CMS payment codes were confidential and nonpublic.  (Tr. 727-28 (Fogel); Tr. 1895 (Rosen).)  Blaszczak referred to Rosen as the "mystery man" because the information he had was "highly sensitive and nonpublic, and he hadn't spoken to anybody yet."  (Tr. 733 (Fogel); GX 804.)  When Rosen responded to an email from Blaszczak, Blaszczak forwarded that email to Huber, Olan, and Fogel, writing "[t]he mystery man Niles responds.  Here's my chance."  (GX 804.)  Huber responded, "[j]ust tell him [Rosen] your [sic] doing god's work."  (GX 1614.)  Fogel replied, "That

is huge dude . . . don't blow it!  You just turned my frown upside down, so let us know if he bites . . . Niles is the man with the keys to these companies' coffins."  (GX 1614.)  Fogel testified that he meant that "the company's pricing is going to be cut by a lot, the stock would go down a lot."  (Tr. 734-35 (Fogel).)  Fogel commented to Huber and Olan that "getting a useful input from Mr. Rosen would be way bigger than bonanza bananas bazooka in my book."  (GX 804.)  Olan responded that he agreed, but that "I think the odds of DB getting shut down by rosen are 103%."  (GX 804.)  Fogel replied, "I don't know, he's pretty good w/ this stuff . . . I'll take the under 103% all day long."  (GX 804.)  Rosen declined Blaszczak's request for information and wrote in an email, "As you clearly understand, I cannot share with your our recommendations to CMS."  (GX 1617.)

### b.    July 6, 2012 Proposed Radiation Oncology Rule

Between approximately May and July 2012, Blaszczak improperly obtained confidential and material nonpublic information about CMS's planned radiation oncology reimbursement cuts from Worrall and passed it to Huber, Olan, and Fogel at Deerfield. Specifically, Blaszczak tipped Huber, Olan, and Fogel that CMS was going to propose cutting the treatment times for which CMS would reimburse for two types of treatment:  (a) a cut from 90 minutes to 60 minutes for intensity-modulated radiation therapy ("IMRT"), and (b) a cut from 60 minutes to 30 minutes for stereotactic body radiation therapy ("SBRT").  (Tr. 746, 777 (Fogel).) This was the exact cut that CMS ultimately announced on July 2, 2012.  (Tr. 1949 (Bassano); GX 2202.)  As witnesses from CMS testified, these planned cuts in treatment times were confidential before CMS publicly announced them.  (Tr. 1945 (Bassano); Tr. 2385 (Hartstein).)   CMS recognized that the cuts to IMRT were "very large" and projected that these cutes would result in an approximately $249 million cut in reimbursements.  (Tr. 1943-45 (Bassano); GX 1310.)

During this time period, Blaszczak met with Worrall at CMS on May 8, 2012, when Worrall signed Blaszczak into CMS's headquarters in Maryland.  (GX 1947-A.)  The next day, May 9, 2012, Blaszczak emailed Fogel asking for a phone call, "Want to update you on one of your favorite topics."  (GX 1947-A.)  Blaszczak then provided information relating to radiation oncology reimbursement rate changes to Huber, Olan, and Fogel, who then used the information to cause Deerfield to make profitable trades in public companies that would be adversely affected by the cuts.  (Tr. 739-86 (Fogel); GX 3000, 806, 809.)  Throughout May and June 2012, Blaszczak continued to provide updates about CMS's internal radiation oncology deliberations to Deerfield so that the fund could trade on the confidential information.  (Tr. 739-86 (Fogel).)  Blaszczak continued to meet with Worrall during this time period, including on June 22, 2012.  GX 845.)

Blaszczak emphasized to Huber, Olan and Fogel that his radiation oncology tip was nonpublic and that, because of his relationships with CMS insiders, rival political intelligence consultants were unlikely to have access to similar information.   (Tr. 739-40 (Fogel).)  For example, in one email from Blaszczak to Huber, Olan, and Fogel about this tip, Blaszczak stated that the information "is not out there so would not expect [] notes on it."  (GX 1628; Tr. 759-61 (Fogel); *see also* GX 1630 (Blaszczak "Ive known eric [assaraf, another D.C. analyst] for a long time – he's a good guy and was my associate for awhile but I can say with 100% confidence he doesn't know anyone at cms.  His guesses are just wild random guesses.  I wouldn't read into what he says."); Tr. 681-82 (Fogel).)

Huber, Olan, and Fogel used the confidential CMS information they received from Blaszczak about the proposed radiation oncology cuts in 2012 to trade in the securities of three companies, Varian Medical Systems (VAR), Elekta AB (EKTAB), and Accuray Incorporated (ARAY), shorting approximately $80 million of their shares and making approximately $2.73

- 13 -

million in profits.[2]  (GX 3000.)  Huber acknowledged that Deerfield made a large profit on this trade and that it was based entirely on the nonpublic information they received from Blaszczak: "We did pretty well on that, and it was really 100% Dave."  (Tr. 782 (Fogel); GX 864.)  This trade was Olan's "top short" at the time.  (GX 859.)

After CMS announced its proposed cuts to radiation oncology, certain senior CMS staff members were forwarded Blaszczak's research note in which he had correctly reported the cuts in the proposed rule before they were publicly announced.  (GX 1817-R.)  Amy Bassano, who had been the head of the CMS group in charge of the rule, testified that Blaszczak's note contained nonpublic information.  (Tr. 1974-75 (Bassano).)  She was surprised by the "[s]pecific information about the cuts in radiation oncology and the particulars of the policy we were going to be proposing. . . . I saw the date of the report, and saw the very specific information that was contained in there, and was sharing with my colleagues that I had concerns that this information could not have been known or been available to the public on July 2nd."  (Tr. 1975, 2118-19 (Bassano).) Hartstein, Bassano's deputy, shared this view.  (Tr. 2386-89, 2401-02 (Hartstein).)

### c.     July 1, 2013 Proposed End Stage Renal Disease Rule

On or about July 1, 2013, after markets closed, CMS announced in a proposed rule that it planned to cut the reimbursement rate for various end stage renal disease ("ESRD") treatments, services, and drugs (known as the "base rate") by 12%.  (GX 2204; Tr. 326 (Blum).) Before the announcement, Blaszczak tipped Fogel that the rate would be cut by 12% and told him that he had obtained this nonpublic information from his sources at CMS.  (Tr. 787-89 (Fogel).)

---

[2]      In June and July 2009, Blaszczak had also passed confidential CMS information to Huber, Olan, and Fogel regarding a radiation oncology rule.  Deerfield used that information to make approximately $2.76 million in profits trading in Varian's stock.  (Tr. 834 (Fogel); Tr. 607-09 (Tavares); GX 3000.)

The evidence showed that Blaszczak met with Worrall immediately before he provided the confidential information about the cuts to ESRD reimbursement rates. On June 14, 2013, Blaszczak met with Worrall. (GX 350-B, 3011; Tr. 2783 (Shimko).) Four days later, on or about June 18, 2013, Blaszczak forwarded Fogel his ESRD prediction and explained that he was "much higher than others on a cut." (GX 878; Tr. 795-96 (Fogel).) Fogel asked, "How high? 4-5%?" (GX 878; Tr. 795-96 (Fogel).) Blaszczak replied, "12% total but phased in over 3 years 50/25/25." (GX 878; Tr. 795-96 (Fogel); *see also* Tr. 1837-39 (Plaford).) That prediction mirrored CMS's internal proposal for the proposed kidney dialysis rule, which was confidential. (Tr. 289 (Blum); Tr. 2029-30 (Bassano); GX 1351, 1364.)

On June 25, 2013, Fogel checked in with Blaszczak on the proposed ESRD rule. (GX 880; Tr. 799-04 (Fogel).) Blaszczak reported, "No change in my numbers. I am pretty confident." (GX 880; Tr. 799-802 (Fogel).) Minutes later, Deerfield entered orders to short Fresenius Medical Care (FMS and FME), a company that would be hurt by such a significant kidney dialysis reimbursement reduction, and continued to short its stock. (GX 3000; Tr. 609-10 (Tavares); Tr. 798-99 (Fogel).) After the reimbursement rate cut of 12% was announced on July 1, 2013, Deerfield made approximately $860,000 in trading profits.[3] (Tr. 609-10 (Tavares); GX 3000.)

### d.    Deerfield's "Cancellation" and Continued Use of Blaszczak

In October 2013, Deerfield decided to cancel its contract with Blaszczak's firm. (Tr. 3266-67; GX 927.) This cancellation followed public reporting that the SEC was investigating

---

[3]    In November 2013, Blaszczak also passed confidential CMS information to Fogel regarding the final ESRD rule. Deerfield made approximately $791,000 in profits trading in Fresenius's stock (FMS) and DaVita Healthcare Partners Inc.'s stock (DVA). (Tr. 822 (Fogel); Tr. 611-14 (Tavares); GX 3000.)

political intelligence firms.  (Tr. 3264 (Brancaccio).)  Huber told Deerfield's Chief Compliance
Officer, Marian Brancaccio, that he supported cancelling the Blaszczak contract.  He claimed that
he did not find Blaszczak's research "all that valuable, and he was hearing a lot of risk associated
to the receipt of this kind of relationship." (Tr. 3265 (Brancaccio).)  Following the cancellation of
Blaszczak's contract, Brancaccio's understanding was that Deerfield would no longer use
Blaszczak as a source of information to inform its trading. (Tr. 3284-85 (Brancaccio).)  Although
Huber purported to support the cancellation of the contract, he continued to use Blaszczak in late
2013.  (Tr. 3285-86 (Brancaccio); GX 1257, 2521-47, 2549-49A.)  The fact that Huber and others
at Deerfield continued to use Blaszczak after the contract cancellation "surprised" Brancaccio.
(Tr. 3286 (Brancaccio).)  Indeed, Huber then pressed for a contract that paid Blaszczak bonuses
for actionable information, which made Brancaccio uncomfortable because it "could incent
[Blaszczak] to provide information that crossed the line potentially."  (Tr. 3287-88 (Brancaccio).)

### 3.    The Scheme to Convert and Use Confidential CMS Information Involving Visium

As noted above, one of Blaszczak's other major clients was Visium, another
healthcare-focused hedge fund, where Plaford was Blaszczak's main contact.  (Tr. 2548 (Epple);
GX 1807.)   From approximately 2011 through 2013, Blaszczak, Plaford, and others participated
in a scheme that paralleled the Deerfield scheme:  to obtain and convert to their own use material
nonpublic information from CMS concerning, among other things, internal deliberations and
upcoming reimbursement decisions.  (Tr. 1785-05, 1826-41 (Plaford).)  Plaford used the nonpublic
information he received from Blaszczak to direct a series of securities trades, understanding that
the information had come from CMS insiders, directly from the "horse's mouth."  (Tr. 1761, 1787-
91 (Plaford); Tr. 1790 (Plaford:  "Blaszczak said sometimes they were directly from his contacts

within CMS that were working on that specific regulation. . . . Friends, colleagues, however he characterized it.").)

Plaford testified that Blaszczak provided him with confidential CMS information about reimbursement rates for home health coverage. Beginning in late May 2013, Blaszczak told Plaford that CMS was going to propose a "huge cut" of "between three and three-and-a-half, and closer to three-and-a-half percent per year from 2014 to 2017." (Tr. 1795 (Plaford); GX 1759.) Between late May and when the proposed rule was ultimately announced in late June 2013, Plaford spoke to Blaszczak several times to get updates on what CMS was considering with respect to the home health rule. (Tr. 1798 (Plaford).) During those calls, Blaszczak said he had a "high conviction" in his prediction, meaning that he was "interacting directly with his counterparties in CMS that were working on the rule, and they were telling him — that's what they were telling him, the cut would be." (Tr. 1798 (Plaford).)

Following the initial tip, Plaford began to direct that Visium short the securities in two companies that would be affected by the home health cuts about Blaszczak tipped Plaford and also sold put options in those companies: Amedisys Inc. (AMED) and Gentiva Health Partners Inc. (GTIV). (Tr. 615-23 (Taveras); Tr. 1833 (Plaford); GX 3000.)[4] After CMS's June 27, 2013 announcement that it would be cutting home health reimbursement rates, consistent with Blaszczak's tip, Visium earned profits of approximately $330,000. (Tr. 623 (Taveras); GX 3000.)

Plaford also testified that Blaszczak provided him with nonpublic CMS information about the proposed ESRD reimbursement cut — the same information that Blaszczak provided to Fogel. (Tr. 1837-39 (Plaford).)

---

[4]     Visium previously had a large short position in both AMED and GTIV, which Plaford maintained as a result of the nonpublic information that Blaszczak provided. (Tr. 615-23 (Taveras); Tr. 1833 (Plaford); GX 3000.)

### C.     The Defendants' Case

The defendants called eight witness and introduced a variety of exhibits. (Tr. 2887-3376.)

### D.     The Government's Rebuttal Case

The Government offered additional exhibits in its rebuttal case.  These exhibits included analyst reports that showed that Blaszczak's tip about upcoming reimbursements cuts was not anticipated by the market and that Huber continued to use Blaszczak as a consultant in 2014, after Deerfield purported to cancel the relationship.  (Tr. 3396-97.)

### E.     The Verdict

The jury deliberated for approximately four days before finding Blaszczak guilty of ten counts, Huber and Olan guilty of five counts each, and Worrall guilty of two counts. Specifically, with respect to Count One (conspiracy to convert government property, to commit Title 15 securities fraud, and to defraud the United States relating to Deerfield) and Count Two (conspiracy to commit wire fraud and Title 18 securities fraud relating to Deerfield), the jury found Blaszczak, Huber, and Olan guilty and acquitted Worrall on both counts.  With respect to Count Three (conversion of government property relating to the 2012 CMS radiation oncology proposed rule), the jury found all four defendants guilty.  With respect to Counts Four through Eight (Title 15 securities fraud relating to various specific trades in Varian), the jury acquitted all four defendants.  With respect to Count Nine (wire fraud relating to the 2012 CMS radiation oncology proposed rule), the jury found all four defendants guilty.   With respect to Count Ten (Title 18 securities fraud relating to the 2012 CMS radiation oncology proposed rule), the jury found Blaszczak, Huber, and Olan guilty and acquitted Worrall.   With respect to Count Eleven (conversion of government property relating to internal CMS information regarding a company

called NxStage Medical, Inc.) and Count Twelve (wire fraud relating to internal CMS information regarding NxStage Medical, Inc.), the jury acquitted Blaszczak and Worrall of both counts.  With respect to Count Thirteen (conversion of government property relating to the 2013 CMS kidney dialysis ESRD proposed rule), the jury found Blaszczak guilty and acquitted Worrall.  With respect to Count Fourteen (Title 15 securities fraud relating to relating to the 2013 CMS kidney dialysis ESRD proposed rule), the jury acquitted Blaszczak and Worrall.  With respect to Count Fifteen (wire fraud relating to the 2013 CMS kidney dialysis ESRD proposed rule) and County Sixteen (Title 18 securities fraud relating to the 2013 CMS kidney dialysis ESRD proposed rule), the jury found Blaszczak guilty of both counts and acquitted Worrall on both counts.  Finally, with respect to Count Seventeen (conspiracy to convert government property and to defraud the United States relating to Visium) and Count Eighteen (conversion of government property relating to the 2013 CMS home health proposed role), the jury found Blaszczak guilty on each count.

F.    The Defendants' Rule 29 and Rule 33 Motions

On April 17, 2018, defendant Huber and Olan filed their Rule 29 motions.  (Dkt. 251 ("Huber-Olan Br.").)  In their motions, Huber and Olan argue that (a) there was insufficient evidence to support their convictions for conversion of government property charged in Count Three (relating to 2012 radiation oncology rule) because (i) the Government did not establish that Huber and Olan knew that the disclosure of information provided by Blaszczak was prohibited, and (ii) the Government did not establish that the scheme "'seriously interfered' with the government's right to use and control its property" (Huber-Olan Br. 5-9); (b) there was insufficient evidence to support their convictions for conspiracy to defraud the United States charged in Count One because the Government did not establish that "the lawful function of [the Centers for Medicare and Medicaid Services ("CMS")] was impeded or obstructed in any manner by the

alleged disclosure of confidential CMS information" (Huber-Olan Br. 9-11); (c) there was insufficient evidence to support their convictions for wire fraud charged in Count Nine and Title 18 securities fraud charged in Count Ten (also relating to the 2012 radiation oncology rule) because (i) the government did not prove that Huber and Olan "had knowledge of the personal benefit allegedly received by Mr. Worrall for unlawfully disclosing CMS information to Mr. Blaszczak," and (ii) "CMS's purportedly confidential information is not 'property' for purposes of 18 U.S.C. § 1343 or 18 U.S.C. § 1348" (Huber Olan Br. 11-13); and (d) there was insufficient evidence to support their convictions for the multi-object conspiracy charged in Count One because the government did not prove that Huber and Olan "had knowledge of the personal benefit received by Mr. Worrall and any other CMS insider in exchange for disclosing confidential CMS information to Mr. Blaszczak" (Huber-Olan Br. 2-5).

On June 8, 2018, defendant Blaszczak filed his Rule 29 and Rule 33 motions. (Dkt. 351 ("Blaszczak Br.").) Defendant Blaszczak argues that (a) there was insufficient evidence to support his ten counts of convictions because the proof did not establish that he "obtained the confidential information at issue from CMS insiders who were not authorized to disclose it" (Blaszczak Br. 13-19); and (b) "a new trial is in the interests of justice because the government's introduction and use of Christopher Worrall's redacted statement to law enforcement and the Court's preclusion of cross-examination as to what Mr. Worrall actually said violated Mr. Blaszczak's Sixth Amendment right to confrontation and his Fifth Amendment right to due process" (Blaszczak Br. 20-29).

Finally, on June 8, 2018, defendant Blaszczak filed his Rule 29 motions. (Dkt. 350 ("Worrall Br.") 5-7.) Worrall argues that the Court should enter a judgment of acquittal with respect to his two counts of conviction because (a) there was insufficient evidence that Worrall

"had access to the [CMS] information at issue" (Worrall Br. 5-7); (b) there is "no evidence that Worrall passed the [CMS] information at issue to Blaszczak" (Worrall Br. 7-13); and (c) the evidence at trial "did not support the inference that Worrall was the source" of the CMS information at issue (Worrall Br. 13-15).

## ARGUMENT

## POINT I

## APPLICABLE LAW

### A.    Rule 29

"'In challenging the sufficiency of the evidence, [a] defendant faces an uphill battle, and bears a very heavy burden.'"  *United States* v. *Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (quoting *United States* v. *Crowley*, 318 F.3d 401, 407 (2d Cir. 2003)); *United States* v. *Lee*, 723 F.3d 134, 143 (2d Cir. 2013); *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011); *United States* v. *Temple*, 447 F.3d 130, 137 (2d Cir. 2006).  A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States* v. *Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).  A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States* v. *Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).  In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter."  *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States* v. *Guadagna*,183 F.3d at 129)

(internal quotation marks and brackets omitted); *United States* v. *Temple*, 447 F.3d at 137 (citing *United States* v. *Autuori*, 212 F.3d at 114).

                In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government.  *See Temple*, 447 F.3d at 136-37.  The Court must analyze the pieces of evidence "in conjunction, not in isolation," *United States* v. *Persico*, 645 F.3d at 104 (quoting *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130; *Persico*, 645 F.3d at 104.  "These standards apply whether the evidence being reviewed is direct or circumstantial." *Id.* at 105 (internal citations omitted).  Indeed, "'the jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence.'"  *United States* v. *Zayac*, 765 F.3d 112, 117 (2d Cir. 2014) (quoting *United States* v. *Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)).

                Finally, "to avoid usurping the role of the jury," *Autuori*, 212 F.3d at 114 (quoting *Guadagna*, 183 F.3d at 129), the Court must resolve all issues of credibility in favor of the jury's verdict, *United States* v. *Kozeny*, 667 F.3d at 139.  "[T]he credibility of witnesses is the province of the jury, and [the Court] simply cannot replace the jury's credibility determinations with [its] own." *United States* v. *James*, 239 F.3d 120, 124 (2d Cir. 2000) (internal quotation and citation omitted); *see Autuori*, 212 F.3d at 114 (court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury").  The Court must also "credit[ ] every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136-37 (internal quotation and citation omitted), because "the task of choosing among competing,

permissible inferences is for the [jury], not for the reviewing court," *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

**B.      Rule 33**

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  A new trial should be ordered "[s]paringly and in the most extraordinary circumstances."  *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *Romero* v. *United States*, 28 F.3d 267, 268 (2d Cir. 1994).  Because "motions for a new trial are disfavored in this Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted."  *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  "It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'"  *Id.*

**POINT II**

**THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR
THE JURY TO CONCLUDE THAT HUBER AND OLAN
CONVERTED GOVERNMENT PROPERTY**

In support of their Rule 29 motion, Huber and Olan contend that the Government presented insufficient evidence on Count Three, conversion of government property with respect to the 2012 proposed radiation oncology rule.  First, they argue that there was no evidence that Huber and Olan knew that the disclosure of information provided to them by Blaszczak was prohibited by any federal statute, administrative rule, or regulation.  (Huber-Olan Br. 6.)  Second, they contend that the Government did not present sufficient proof that the conversion of this

- 23 -

confidential CMS information "seriously interfered" with the Government's right to use and control its own property.  As explained below, both claims fail.

A.      **The Evidence Demonstrated that Huber and Olan Appreciated that Blaszczak's Disclosure of CMS Confidential Information Was Prohibited**

As the Court instructed the jury, in order to convict Huber and Olan on Count Three, the Government had to prove, among other elements, that the defendants knowingly converted government property — that is, that they used "the property in an unauthorized manner in a way that seriously interfered with the government's right to use and control the property, knowing that the property belonged to the government, and knowing that the government didn't authorize such use."  (Tr. 3925.)   The Court also instructed the jury that "[t]he disclosure of government information may be unauthorized within the meaning of the governing statute only if the disclosure of the information at issue was affirmatively prohibited by a federal statute, administrative rule or regulation, or any longstanding government practices."  (Tr. 3945-46)); *see also United States* v. *Lambert*, 446 F. Supp. 890, 899 (D. Conn. 1978) ("Thus, the jury may consider only transfers of information affirmatively prohibited by other federal statutes, administrative rules and regulations, or, perhaps, longstanding government practices."); Tr. 3435-36, 3441-47 (charge conference).

As a threshold matter, Huber and Olan are simply wrong that the Government was required to prove that they knew that the disclosure of the information by Blaszczak was prohibited by a federal law or regulation.  (Huber-Olan Br. 6.)  As the Court noted during the charge conference, the disclosure could also be prohibited by longstanding Government practices prohibiting the disclosure of such information.  (Tr. 3945.)  Here, numerous CMS witnesses testified that it was CMS's practice to prohibit the dissemination of proposed and final rules before CMS's official announcement.  (Tr. 198 (Blum); Tr. 1924-29 (Bassano); Tr. 1540 (Samuels).) These witnesses also testified to the training given to CMS employees on protecting confidential

information from disclosure.  (Tr. 199-200, 215-16 (Blum); Tr. 1929 (Bassano).)  In any event, as the Court recognized in its jury instructions and as the Government proved at trial, the dissemination of confidential CMS information was specifically prohibited by federal ethics regulations that had the force of law.  (Tr. 3946; GX 2206.)

The notion that the Government had to prove that Huber and Olan were aware of the *particular* rule or law prohibiting the dissemination of confidential CMS information about proposed rate cuts is unsupported in the law.  *See United States* v. *Whab*, 355 F.3d 155, 162 (2d Cir. 2004) (noting the "traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required" (internal quotation marks omitted)).  Rather, the Government was simply required to prove — and did prove — that Huber and Olan knew these disclosures were unauthorized.  Indeed, the evidence at trial was overwhelming that they appreciated this fact.  For example:

- In emails predating the 2012 radiation oncology announcement, Huber and Olan acknowledged that Blaszczak was obtaining nonpublic CMS information that he was not authorized to have.  (GX 510 (Huber to Olan and others in 2009, noting that "broadening our relationship with Dave [Blaszczak] might help maximize the value we get from his unique flow of info"); GX 711 (Fogel to the Devices team about Blaszczak information in 2010 about radiation oncology cuts, "[t]here is a closed-door meeting next week and Blaczack [sic] has a guy in there"); GX 804 (Olan to Huber and Fogel, stating that "the odds of DB getting shut down by [Niles Rosen] are 103%" when the Devices team had tasked Blaszczak to get confidential CMS information about genetic testing from Rosen).)

- 25 -

- In emails surrounding Blaszczak's tip to Deerfield about the 2012 radiation oncology cuts, Blaszczak emphasized to Huber and Olan that the information was nonpublic, which is a clear indication that no one was authorized to disclose that information to Blaszczak.  (GX 1628 (Blaszczak to Fogel, Huber, and Olan, stating that "the time adjustment [radiation oncology cuts] is not out there so would not expects [sic] notes on it"); GX 816 (Olan to Fogel and Huber, noting that Blaszczak information about the radiation oncology cuts is attractive to him because "its [sic] not on radar screens"); GX 852 (Olan noting the "first public . . . mention of rad onc cuts" months after Blaszczak had tipped them about the cuts).)

- In addition, Fogel testified that Blaszczak told Huber, Olan, and Fogel that the nonpublic information he was providing had been obtained from inside CMS, and they understood that Blaszczak was not obtaining the information from public sources.  (Tr. 680, 737-38, 750, 767, 790-92, 796, 869, 881, 1467-68, 1476 (Fogel).)  All three appreciated that CMS insiders could not just give out this type of information to the general public.    (Tr. 737, 723, 725, 1468 (Fogel).)  As to the radiation oncology tip in 2012, Blaszczak emphasized that it was nonpublic and that, because of his relationships with CMS insiders, rival political intelligence consultants were unlikely to have access to similar information.  (Tr. 739-40 (Fogel).)  Fogel also testified that he, Huber, and Olan discussed the illegal edge Blaszczak was providing them.  (Tr. 737-38 (Fogel).)

### B.     The Evidence Showed that the Conversion of Confidential CMS Information Seriously Interfered with the Government's Right to Use and Control Its Own Property

Huber and Olan also ignore the clear evidence that their scheme seriously interfered with the Government's right to use and control its own property.  CMS's policy was to release proposed rate cuts to the general public at the same time after the end of the trading day, to protect the integrity of the financial markets.  (Tr. 199 (Blum); Tr. 2379 (Hartstein); Tr. 2662 (Epple).)  Huber, Olan, and Fogel were aware of this policy.  (*See* Tr. 867, 1465 (Fogel); GX 607.)  This CMS policy was also designed to ensure that the public has an "equal" and "fair" opportunity to digest CMS's announcements.  (Tr. 197-99 (Blum); Tr. 1926-27 (Hartstein).)   As Jon Blum testified, CMS's rulemaking process is based on the notion that all stakeholders for a proposed rule have the right to comment on these rules at the same time.  (Tr. 209 (Blum).)  This policy ensured that no one obtained an unfair advantage in trying to influence CMS policy.  (Tr. 209 (Blum:  "The [CMS] processes are designed to be fair to all stakeholders, to make sure that everybody has the right to comment at the same time").)

The witnesses at trial explained why this was important to CMS.  Blum testified that leaks can trigger predecisional lobbying by interest groups, which can result in process delays and the failure to implement rules that are beneficial to the public.  (Tr. 209 (Blum:  "[W]hen a document, predecisional materials, get leaked, that begins to trigger lobbying, begins to trigger powerful forces to try and stop decisions").)  Bassano also testified that when leaks occur, CMS restricts the internal flow of information, which can negatively affect CMS's rule-making process and result in "suboptimal" healthcare policy.  (Tr. 1932-33 (Bassano).)   While the defendants may disagree with these witnesses — witnesses with firsthand knowledge of how the CMS process works and the damage that occurs when it is corrupted — the jury was obviously entitled to credit

- 27 -

their testimony.  Moreover, the jury was also entitled to infer that these general harms and inevitable consequences occurred with respect to radiation oncology in 2012.

**POINT III**

**THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR
THE JURY TO CONCLUDE THAT HUBER AND OLAN CONSPIRED
TO DEFRAUD THE UNITED STATES**

Huber and Olan also contend that the Government offered insufficient evidence that they conspired to defraud the United States because the Government failed to prove that CMS's lawful functioning was impeded or obstructed.  (Huber-Olan Br. 9-10.)  The defendants are again wrong.

In *United States* v. *Peltz*, 433 F.2d 48 (2d Cir. 1970), the Second Circuit rejected this precise argument in affirming a Section 371 conspiracy to defraud conviction of a lawyer who conspired with an SEC employee to obtain confidential information about matters pending before the SEC and used that information to profitably trade.  On appeal, the defendant argued that the Section 371 conviction should be overturned because the conspiracy did not intend to prevent the SEC from taking the actions that were the subject of the leaks.  Writing for the Circuit, Judge Friendly rejected this argument, noting that:

> An agreement whereby a federal employee will act to promote private benefit in breach of his duty thus comes within the statute if the proper functioning of the Government is significantly affected thereby.
>
> It scarcely needs argument that the high repute and effective functioning of the SEC — conspicuous for its zeal in preventing the misuse of inside information — would be significantly compromised by arrangements whereby an individual could obtain information about its impending action from one of its employees and profit from having such knowledge before this became available to the public generally.  Public confidence essential to the effective functioning of government would be seriously impaired by any

- 28 -

> arrangement that would enable a few individuals to profit from advance knowledge of governmental actions . . . .

*Id.* at 52.

Similarly here, the defendants' scheme involved a federal employee (Worrall) who leaked information that benefited a private interest (Blaszczak, Huber, and Olan) in breach of his public duties. Such an arrangement undermines the public's trust in CMS, which trust is also essential for the agency to properly function and properly administer the country's healthcare policies. Indeed, Blum testified that where, as here, predecisional information is leaked, it undermines the public's trust in the fair functioning of the agency and its treatment of the various stakeholders impacted by the proposed rule and, ultimately, the Government's control over its information.[5] (Tr. 209 (Blum); *see also* Tr. 1926-27 (Hartstein).)

The defendants' arguments also fail for many of the reasons noted above with respect to the conversion count. (*See supra* Point II.) Blum testified that when confidential CMS information is leaked, lobbyists line up to stop the agency's proposals before they are even announced. Bassano also testified how CMS's rule making process suffers when there are leaks.[6]

---

[5]    It should be noted that proving the "intent to defraud the United States may be incidental to another primary motivation or purpose." *United States* v. *Gurary*, 860 F.2d 521, 525 (2d Cir. 521); *see also United States* v. *Southland Corp.*, 760 F.2d 1366, 1373 (2d Cir. 1985) ("defendants . . . cannot escape liability by showing that this intent was merely incidental to some other action which constituted their primary motivation"). Here, even if Huber's and Olan's primary motivation was to trade on the confidential information, they still possessed the requisite intent (demonstrated above) to defraud the United States.

[6]    Further, as the Niles Rosen incident demonstrates, Huber and Olan actually did seek to alter CMS policy. Huber and Olan tasked Blaszczak to get confidential information from Rosen about genetic testing and also to influence Rosen and CMS to reduce the reimbursement rates for genetic testing. (GX 1617 (Blaszczak email to Rosen advocating for why genetic tests should be reimbursed at a lower rate); Tr. 727-35 (Fogel).) Huber, Olan, and Fogel wanted CMS to reduce these reimbursement rates because they held a short position in the stock of Myriad Genetics, which would be negatively impacted by a reduction in the reimbursement rates. (GX 1614 (Fogel

Finally, with respect to the Section 371 count of conviction, the defendants' arguments fail for the additional reason that success of the charged conspiracy is not an element of the crime. The Government need only prove that the charged conspiracy existed and that defendants Huber and Olan knowingly joined that conspiracy.[7]

### POINT IV

### THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT HUBER AND OLAN COMMITTED WIRE FRAUD AND TITLE 18 SECURITIES FRAUD

Next, Huber and Olan raise two challenges to the wire fraud (Count Nine) and Title 18 securities fraud (Count Ten) counts. First, they contend that the Government offered insufficient proof that Huber and Olan had knowledge of the "personal benefit" Worrall received for disclosing confidential CMS information to Blaszczak. (Huber-Olan Br. 11.) Second, they argue that CMS's confidential information is not "property" under the wire fraud and Title 18 securities fraud statutes. (Huber-Olan Br. 12-13.) As set forth below, these arguments are without merit. Additionally, with respect to the second argument, it was plainly waived by the defendants, who did not advance this argument as part of their pretrial motions to dismiss the Indictment.

---

noting that Rosen had the keys to Myriad's "coffins" because the stock price would decrease and Deerfield would benefit if Rosen recommended lower reimbursement rates).)

[7]     In their joint brief, Huber and Olan preserve for appeal their previously denied pretrial motion that government information is not a thing of value under Title 18, United States Code, Section 641, and that Title 18, United States Code, Section 371 is not properly charged in a case where the alleged object of the conspiracy is something other than money or property. As the Government noted in its brief, and as the Court recognized in denying the defendants' pretrial motions, these arguments should be rejected under well-established and binding Second Circuit precedent. (Dkt. 94, at 39, 43-44.)

A.    A "Personal Benefit" is Not Required Under the Wire Fraud or Title 18
      Securities Fraud Statutes

During the charge conference, the Court properly rejected the defendants' attempt
to engraft elements and case law relating to Title 15 securities fraud charges onto the wire fraud
and Title 18 securities fraud charges contained in the Indictment, and for good reason.  (Tr. 3474.)
No court, to the Government's knowledge, has ever held that the personal benefit element of
insider trading charges under Title 15 also constitutes an element of wire fraud or securities fraud
under Title 18.   The wire fraud and securities fraud statutes codified in Title 18 are entirely
different statutes with a distinct legislative history from the Title 15 securities fraud provision and
related regulations promulgated by the SEC.

With respect to the wire fraud statute in particular, the Supreme Court, in the
context of an insider trading scheme, has noted the distinction in the elements and underlying
origin of that statute and Title 15 securities fraud.  In *Carpenter* v. *United States*, 484 U.S. 19
(1987), an eight-member Supreme Court unanimously affirmed the mail and wire fraud
convictions of a journalist who leaked the content of his market-moving column to his friends
before its publication, but split evenly on the question of whether he and the other defendants had
violated Title 15 — thus making clear that the elements of the Title 15 and Title 18 offenses were
not coextensive.  *Id.* at 24.  Addressing the Title 18 charges, the Court ruled that the journalist's
appropriation for his own purposes of proprietary confidential information belonging to his
employer was fraud, and that use by others of that same information was also fraud, without more.
*See id.* at 26-27 ("it is sufficient that the [Wall Street] Journal has been deprived of its right to
exclusive use of the information, for exclusivity is an important aspect of confidential business
information"; "[t]he concept of fraud includes the act of embezzlement, which is the fraudulent
appropriation to one's own use of the money or goods entrusted to one's care by another (internal

- 31 -

quotation marks omitted)).  This analysis was distinct from the Supreme Court's breach of duty

analysis in *Dirks* v. *SEC* in the Title 15 securities fraud context.  463 U.S. 646, 656-65 (1983).

Indeed, as Judge Winter observed a few years after *Carpenter*, the species of breach at issue in

*Carpenter* and *Dirks* are different:

> The *Dirks* rule is derived from securities law, and its limitation to
> information obtained through a breach of a fiduciary duty is, as
> noted, influenced by the need to allow persons to profit from
> generating information about firms so that the pricing of securities
> is efficient.  The *Carpenter* rule, however, is derived from the law
> of theft or embezzlement, and a tippee's liability may be governed
> by rules concerning the possession of stolen property.

*United States* v. *Chestman*, 947 F.2d 551, 581-82 (2d Cir. 1991) (Winter, J., dissenting in part).

Likewise, courts have recognized that the Title 18 securities fraud statute, adopted

by Congress as part of Sarbanes-Oxley around 2002, is a close relative of the wire fraud statute,

and not simply a repeat of the Title 15 securities fraud statute and implementing rules promulgated

as part of the Securities Exchange Act of 1934.  Indeed, in enacting Section 1348, Congress's

"overarching purpose . . . was to broaden the range of conduct proscribed by existing federal

securities laws."  *United States* v. *Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009).  *See also*

*United States* v. *Mahaffy*, 2006 WL 2224518, at *18 (E.D.N.Y. Aug 2, 2016) ("[T]he present

scheme might well have been charged either as a more general mail and wire fraud or a more

specific 10b-5 securities fraud."); *United States* v. *Melvin*, 143 F. Sup. 3d 1354, 1374-76 (N.D.

Ga. 2015) (rejecting argument that personal benefit and other elements of Title 15 securities fraud

are imported into Title 18 securities fraud, which mirrors the wire fraud statute); *United States* v.

*Slawson*, 2014 WL 5804191, at *6-7 (N.D. Ga. Nov. 7, 2014) (same).

At least one other Judge in this District has also rejected a defendant's effort to

engraft the elements of Title 15 securities fraud charge onto a Title 18 securities fraud charge.  *See*

*United States* v. *Chow*, 17 Cr. 667 (GHW) (S.D.N.Y. Apr. 20, 2018) (finding elements of Title 18 securities fraud differ from elements of Title 15 securities fraud).

> **B.     CMS's Confidential Information is "Property" Under the Wire Fraud and Title 18 Securities Fraud Statutes**

Raised for the first time in a few paragraphs in their Rule 29 motion after the close of the Government's case, Huber and Olan argue, based on *United States* v. *Cleveland*, 531 U.S. 12, 15 (2000), that they should be acquitted of wire fraud and Title 18 securities fraud because CMS confidential information does constitute not "property" for the purposes of those statutes. (Huber-Olan Br. 12-13.)  This argument is both waived and wrong.

With respect to waiver, Huber and Olan could have, and failed, to make this argument in pretrial motions, including in their motion to dismiss the initial Indictment.[8]  The defrauding of CMS through the theft and conversion of their confidential information was squarely and explicitly presented in the initial Indictment (and the Indictment).  As Rule 12(b)(3) of the Federal Rules of Criminal Procedure provides, motions alleging a defect in the indictment, including a failure to state an offense, must be made before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  *See also United States* v. *McFarlane*, 198 F. App'x 56, 58 (2d Cir. Aug. 30, 2006) ("Motions challenging 'defects in the indictment' must be made prior to trial").  The Rule 12(b)(3) criteria were certainly satisfied prior to trial with respect to the defendants' lately raised argument on this issue.  The initial Indictment clearly alleged that the wire fraud and Title 18 securities fraud charges were

---

[8]     In their motion to dismiss the initial Indictment, Huber (joined by Olan) argued, among other things, that under Section 641, information was not a thing of value.  They did so to explicitly preserve the issue for appeal, even though binding Second Circuit precedent held otherwise.  Thus, they clearly understood the need to make this type of motion during the pretrial phase to preserve it and their failure to do so constitutes waiver.

premised on the theft of confidential information from CMS. (*See* Dkt 10, at ¶ 81 (Count Nine wire fraud: alleging "scheme to defraud CMS of confidential information related to CMS's proposed radiation oncology rule by improperly obtaining that information through deceptive means and then converting that information to their own use"); *id*. at ¶ 83 (Count Ten Title 18 securities fraud: alleging similar scheme).)[9] Additionally, no trial on the merits was necessary for the defendants to assert the purely legal argument they now advance.[10]

Having failed to raise this argument in a timely manner, it is waived. Indeed, the Second Circuit has held that failure to make a 12(b)(3) motion before trial "constitutes waiver . . . even where, as here, the trial judge considers the issue during trial." *United States* v. *Nurse*, 205 F.3d 1326, at *2 (2d Cir. 2000) (summary order) (quoting *United States* v. *Ulloa*, 882 F.2d 41, 43 (2d Cir.1989); citing *United States* v. *Sisca*, 503 F.2d 1337, 1349 (2d Cir. 1974))). Of course, this issue was not even raised by the defense during the Government's case-in-chief. Instead, it was raised for the first time immediately after the Government rested. No good cause exists for relief from such a waiver, and their challenge to their convictions on this issue should be rejected on this basis alone.

Even if the argument had not been waived, it is without merit. As recognized in cases as far back as *United States* v. *Carpenter*, 484 U.S. 19 (1987) (discussed above), courts have recognized that the wire fraud statute[11] criminalized the embezzlement and personal use or

---

[9]     The Indictment contained identical language. (*See* Dkt. 137, at ¶ 86 (Count Nine) and ¶ 88 (Count Ten).)

[10]     As the Court may be aware, the issue of whether confidential government information can be property under the wire fraud statute has also been raised in *United States* v. *Middendorf*, 18 Cr. 36 (JPO) (S.D.N.Y. 2018), currently pending before Judge Oetken. In that case, and unlike here, the defendants properly brought the issue to the district court's attention in a pretrial motion to dismiss and the issue is currently *sub judice*.

[11]     As set forth above, the Title 18 securities fraud statute is viewed to "mirror" the wire fraud statute (*Melvin*, 143 F. Supp. 3d at 1374-76), and the arguments set forth in this section with respect

disclosure of confidential business information from an entity who trusted the relevant insider with such information. The Court in *Carpenter* noted that "[c]onfidential business information has long been recognized as property" and agreed with the proposition that "the Journal's interest in the confidentiality of the contents and timing of" its column is "a property right." *Id.* at 25-26 (citing *Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986, 1001-04 (1984); *Dirks* v. *SEC*, 463 U.S. 646, 653, n.10 (1983); *Board of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 250-51 (1905)). Notably, the Court did not require the *Wall Street Journal* to have sustained a monetary loss; rather, it held, "it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* at 26-27.[12] While *Carpenter* utilized the phrase "confidential business information," the Second Circuit has subsequently noted that this language from *Carpenter* "merely *describes* the confidential information in that case; it does not require that *all* confidential information must be of the same nature to be considered property." *United States* v. *Grossman*, 843 F.2d 78, 86 (2d Cir. 1988) (affirming the mail fraud conviction of a law firm

---

to the wire fraud statute accordingly apply with equal force to the Title 18 securities fraud count of conviction.

[12] A number of cases have since reaffirmed the principle that confidential information constitutes property in the context of wire fraud. *See, e.g.*, *United States* v. *Wang*, 898 F. Supp. 758, 760 (D. Col. 1995) (holding that a copyrighted computer file is "intangible intellectual property"); *United States* v. *Martin*, 228 F.3d 1, 16-17 (1st Cir. 2000) (upholding *Carpenter* wire fraud charge based on defendant's embezzlement of confidential information from a veterinary products company); *United States* v. *Seidlitz*, 589 F.2d 152, 160 (4th Cir. 1978) (stolen data and access codes from computer company property under wire fraud statute because of the "substantial sums" the employer invested to modify the system, its competitive advantage because of the system, and the steps the employer took to prevent persons other than employees and clients from using the data); *United States* v. *Willis*, 737 F. Supp. 269, 276 (S.D.N.Y. 1990) (business information provided by patients to psychologist property because the owner of the intangible, though valuable, confidential information "had a pecuniary interest in the non-disclosure of the information").

associate that misappropriated information and rejecting argument that information did not constitute "property" because it was not of commercial value to the firm).

Contrary to the defendants' arguments, the Supreme Court's decision in *Cleveland* v. *United States*, 531 U.S. 2 (2000), did not somehow eliminate the protections of confidential information provided by the wire fraud statute.   In *Cleveland*, the Supreme Court reversed a conviction for mail fraud where the defendant lied on an application to a Louisiana state agency for a video poker license, holding that state and municipal licenses do not constitute the "property" of a state agency licensor for purposes of Section 1341.  *See generally id.*  In so doing, the Court held that the State's core interest with respect to the licenses was "regulatory" in nature and that the issuance of the licenses was simply an "exercise[] of state police powers."  *Id.* at 20-21.  The Court rejected the argument that the State held a property interest based simply on its right to issue, renew, and revoke the licenses, as those powers merely reflected Louisiana's "sovereign power to regulate."  *Id.* at 23.  Federalism concerns also clearly colored the Court's reasoning.  The Court therefore declined to "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress," which would be affected by "subject[ing] to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities."  *Id.* at 24.

The defendants' attempt to apply *Cleveland* to this case is without merit.  The nature of the property interest alleged in this case is wholly different from the interest at issue in *Cleveland*.  This case relates to the embezzlement of confidential information, which has long been recognized as falling within the ambit of property protected by the wire fraud statute, while *Cleveland* related to the exercise of a state agency's sovereign powers in the granting or withholding of government licenses.

- 36 -

Indeed, a number of cases have applied *Carpenter* to uphold the wire fraud convictions for the theft of information held by an agency of the federal government. For example, in *United States* v. *Fowler*, 932 F.2d 306 (4th Cir. 1991), a former Department of Defense employee was convicted of wire fraud for stealing secret documents from the Department and providing them to his new employer, Boeing (and certain other defense contractors). On appeal, the defendant challenged the applicability of Section 641, the statute criminalizing the theft of government property, but not the application of the wire fraud statute. Nevertheless, the Fourth Circuit, in upholding the conviction, cited *Carpenter* for the principle that this kind of information constitutes property under Section 1343. *Id*. at 310.

In *United States* v. *Czubinski*, 106 F.3d 1069 (1st Cir. 1997), an IRS contract employee was charged with wire fraud for improperly accessing individual taxpayer files. The First Circuit reversed his conviction because he only accessed the information, rather than also disseminating or otherwise using it. *Id.* at 1075. In doing so, however, the Court of Appeals never suggested that *Carpenter* and its progeny were somehow inapplicable to cases involving confidential government information because it was not "business information." The First Circuit agreed that "confidential information may constitute intangible 'property' and that its unauthorized dissemination or other use may deprive the owner of its property rights." *Id.* at 1074 (citing *Carpenter*, 484 U.S. at 26). The Court recognized that "[w]here such deprivation is effected through dishonest or deceitful means, a 'scheme to defraud,' within the meaning of the wire fraud statute, is shown." *Id.* (citing *Carpenter*, 484 U.S. at 27). The Court concluded: "Had there been sufficient proof that Czubinski intended either to create dossiers for the sake of advancing personal causes or to disseminate confidential information to third parties, then his actions in searching files

could arguably be said to be a step in furtherance of a scheme to deprive the IRS of its property interest in confidential information." *Id*.

In light of these decisions — which while decided pre-*Cleveland* continue to be cited as good law post-*Cleveland* — and in the absence of decisions to the contrary, there is simply no basis to conclude that the "confidential information" that *Carpenter* protects must be of commercial value or relating to commercial transactions.  Indeed, the cases identified by the Government are firmly to the contrary.[13]

Accordingly, the defendants' argument should be rejected.

## POINT V

### THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT HUBER AND OLAN COMMITTED THE MULTI-OBJECT TITLE 371 CONSPIRACY

Huber and Olan argue in a footnote (p. 5 n. 6) that the Court should enter a judgment of acquittal as to Count One — which charged a multi-object conspiracy, one object of which was a Title 15 securities fraud offense — because the Government failed to offer proof that they had

---

[13]     As just another example, in *United States* v. *Kernell* the court found that the contents of Sarah Palin's personal email account — including pictures — were property under the wire fraud statute.  2010 U.S. Dist. LEXIS 36477, at *8 (E.D. Tenn. 2010).  Citing *Czubinski*, the court rejected the defendant's claim that the information at issue need be economic or commercial in nature, focusing on the simple fact that Palin's property interest in the information was harmed when she lost exclusive control over its contents.  *Id*. at 11-12.  *See also Grossman*, 843 F.2d at 85-86 (affirming *Carpenter*-based conviction for theft of law firm information with no intrinsic commercial value); *United States* v. *Rafatnejad*, 18 Cr. 94 (JMF) (S.D.N.Y.) (pending indictment charging wire fraud relating to state-sponsored Iranian hacking into email accounts of university professors in the United States to steal academic data).

any knowledge of a personal benefit received by Worrall or any other CMS insider in exchange for disclosing confidential CMS information to Blaszczak.  (Huber-Olan Br. 2-5.)

As a threshold matter, the jury was not asked to return a special verdict on the object of the conspiracy charged in Count One.  Thus, we do not know which object or objects the jury unanimously found, although it bears noting that Huber and Olan were found guilty of conversion of government property (Count Three), which is also an object of Count One.  Huber and Olan were also acquitted of the substantive Title 15 securities fraud counts.

In any event, Huber and Olan ignore the incontrovertible evidence providing that they knew that Blaszczak obtained confidential CMS information from friends and former colleagues at CMS with whom he had close relationships.  As set forth above, Huber and Olan also understood and appreciated that the information Blaszczak was obtaining from CMS insiders was nonpublic and confidential and should not have been disclosed outside of CMS (*see supra* Point II.A).  Finally, based on the above, the jury could rationally also conclude that the leaking of this information to Blaszczak was not in furtherance of carrying out CMS's mission.  When taken together, a rational jury could easily conclude based on the evidence adduced at trial that Huber and Olan knew of, or were at least willfully blind to the fact of, the "benefit" conferred upon CMS insiders, as that term is defined.  *See United States* v. *Salman*, 137 S. Ct. 420, 429 (2016) (personal benefit element satisfied "when an insider makes a gift of confidential information to a trading relative or a friend"); *United States* v. *Martoma*, — F.3d —, 2017 WL 9620394 (2d. Cir. June 25, 2018, as amended), at *7 ("The 'benefit' element of § 10(b) is satisfied when the tipper 'intend[s] to benefit the . . . recipient' or 'makes a gift of confidential information to a trading relative or friend.'" (quoting *SEC* v. *Warde*, 151 F.3d 42, 48 (2d Cir. 1998); *Dirks*, 463 U.S. at 664))); *id.* at *8 ("[A]s is clear from the purpose of the personal benefit element, the 'broad

- 39 -

definition of personal benefit set forth in *Dirks*,' and the variety of benefits we have upheld, the evidentiary 'bar is not a high one.'" (quoting *SEC* v. *Obus*, 693 F.3d 276, 292 (2d Cir. 2012))).

Specifically, Fogel testified that Blaszczak told Huber, Olan, and him that he (Blaszczak) obtained confidential CMS information from his friends at CMS. (Tr. 1467-68 (Fogel).) Fogel also had conversations with Huber and Olan about how Blaszczak worked his CMS relationships to get confidential CMS information. (Tr. 1468 (Fogel).) The emails also bear out this point. In one email to Huber and Olan, Blaszczak mentions meeting with a "friend" at CMS. (GX 1642.) In another email, Huber describes Blaszczak as "plugged in" at CMS, meaning he knew the right people and had the right relationships. (GX 1065.) In yet another email, Huber noted that Blaszczak has "a guy in there," referring to a CMS Blaszczak source in a meeting about radiation oncology. (GX 711.) Indeed, that was the whole point in hiring Blaszczak — to have him trade on his CMS network of relationships and friendships to get confidential information. (Tr. 723, 1468 (Fogel).) Given this evidence, if Huber and Olan did not actually know that Blaszczak was obtaining the confidential CMS information from his close relationships and friendships at CMS, it is only because they consciously avoided learning that fact.

Accordingly, Huber's and Olan's motion should be denied.

## POINT VI

### THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT BLASZCZAK IMPROPERLY OBTAINED CONFIDENTIAL CMS INFORMATION

Blaszczak argues that all of his counts of conviction should be vacated because the evidence adduced at trial was insufficient to establish that he obtained confidential information from CMS insiders who were not authorized to disclose it. (Blaszczak Br. 13-21.) In doing so, Blaszczak simply ignores large portions of the trial evidence, including his own emails

acknowledging the impropriety of his conduct, and reiterates claims previously rejected by the jury.  His claims should be denied.

*First*, Blaszczak contends that there was insufficient evidence that he received confidential information from CMS insiders, rather than from sources outside of CMS.  (Blaszczak Br. 15-17.)  Unfortunately for Blaszczak, his own emails tell a different story.  For example, when comparing himself to a rival political intelligence consultant, Blaszczak wrote to Fogel:  "[I] can say with 100% confidence he [the rival consultant] doesnt [sic] know anyone at cms.  His guess are just wild random guesses.  I wouldnt [sic] read into what he says."  (GX 1630.)  Thus, Blaszczak himself admits that his information is valuable and accurate because it comes from sources within CMS, and not from anywhere else.

The specific rate cut information Blaszczak provided to Fogel, Huber, Olan, and Plaford highlights this point.  Contrary to Blaszczak's contention, the rate cut information for the 2012 radiation oncology cuts, the 2013 ESRD cuts, and the 2013 home health cuts was not public available from sources outside CMS *before* Blaszczak provided this information to Deerfield and Visium.  (Blaszczak Br. 15-16.)  While Ipsita Smolinski also correctly predicted the 2012 radiation oncology cuts, her prediction came on June 14, 2012 (GX 832) — over a month *after* Blaszczak had first tipped Deerfield about the cuts (GX 806).  Similarly, although the public expected there may be general cuts to ESRD and home health in 2013, Blaszczak had the specific percentages for these cuts, which were nonpublic and also off market consensus (Tr. 3396-97) — another indicator that the information Blaszczak provided his clients came from CMS and not public sources.

Ultimately, as Fogel and Plaford testified, Blaszczak's value was obtaining information from within CMS, rather than from other sources.  (Tr. 1467-68 (Fogel); Tr. 1790-92 (Plaford).)  Blaszczak specifically told both men that his information came from CMS insiders.

With respect to the home health cuts, Plaford testified that Blaszczak told him he had a "high conviction" in his prediction, meaning that Blaszczak was "interacting directly with his counterparts in CMS that were working on the rule, and they were telling him — that's what they were telling him, the cut would be."  (Tr. 1798 (Plaford).)  And it was obvious to others in the scheme that Blaszczak got his information from within CMS.  (GX 1070 ("Blazacks [sic] comments pre-news suggest he had a read of draft documents . . . Street expects 15% cuts[.] Blazack [sic] calling for 33% cuts."); GX 520 (noting Blaszczak's value to Huber and Olan "If CMS is telling him stuff . . ."); GX 1065 (Huber remarking on Blaszczak's value that "Blaszack [sic] . . . is way better plugged in to CMS").)

*Second*, Blaszczak argues that to the extent he obtained information from within CMS, he obtained it from CMS senior staff, who were authorized to disclose it.  This argument has no basis in the record.  Blaszczak previously worked at CMS, received training in the prohibitions against insider trading (GX 435), and was therefore well-aware that information about the proposed rate cuts should not be disclosed before CMS's official announcement.  Blaszczak's actions also confirm this understanding.  After obtaining a confidential CMS document related to the ESRD rate cuts in 2013, Blaszczak whited out the confidentiality banner on the document before sending to his client at Amgen, precisely because Blaszczak knew he should not have this document.  (GX 1406.)  In addition, in an email exchange with Amgen employee Ruth Hoffman, Hoffman told Blaszczak that the person who took over for him at his old firm is "going to suck at his job" if this new person only got public information.  (GX 1507.)  It was obvious to Hoffman, as it was to Blaszczak, that he was obtaining CMS information that he was not supposed to have.

Contrary to Blaszczak's claims, Fogel did not testify that he believed Blaszczak's information came from senior CMS employees, who, Blaszczak contends, may have had authority

to make CMS information public.  (Blaszczak Br. 17-18.)  In fact, Fogel testified that he believed Blaszczak's information came from CMS staffers who did not have the ultimate say in whether a proposed rate cut would be enacted and who could be overruled by management or others in the political process outside of CMS.  (Tr. 755-56 (Fogel).)  In other words, the information came from someone within CMS like Christopher Worrall, as Fogel understood it.  While it may be true that certain senior CMS employees could choose to disclose CMS information, all of the CMS witnesses that testified said that predecisional information about proposed rate cuts was the most sensitive CMS information and should not be disclosed ahead of CMS's public announcement. (Tr. 198 (Blum); Tr. 1924-29 (Bassano); Tr. 2382 (Hartstein).)

On this record, it is simply incredible that Blaszczak believed the CMS information he obtained came from senior CMS officials authorized to disclose it.  Instead, the overwhelming evidence admitted at trial demonstrated that Blaszczak obtained confidential CMS information from CMS insiders who were not authorized to disclose such information.  Accordingly, Blaszczak's motions under Rule 29 and Rule 33 should be denied.

**POINT VII**

**THE COURT PROPERLY ADMITTED WORRALL'S STATEMENTS TO LAW ENFORCEMENT PURSUANT TO *BRUTON***

Blaszczak contends that the admission of Worrall's *Brutonized* statements to law enforcement violated his Sixth Amendment right to confrontation and his Fifth Amendment right to due process.  (Blaszczak Br. 20-29.)  He is wrong.  The *Brutonized* statements did not give any indication to the jury that Worrall's original statement contained Blaszczak's name and these statements, standing alone, did not connect Blaszczak to the charged crimes.  Further, any error in admitting these statements was harmless given the overwhelming evidence of Blaszczak's guilt.

- 43 -

A.      **Background**

On February 9, 2018, the Government produced to Blaszczak copies of FBI 302s reflecting (a) unprotected statements that Worrall made when he was first approached by the FBI and U.S. Department of Health and Human Services ("HHS") in September 2015 (the "Approach Statements"), and (b) statements that Worrall made during proffer sessions with the Government. As is relevant here, Worrall lied during the FBI approach, stating that he and Blaszczak only spoke about work.  (Tr. 2194-95 (Moore).)  During the approach, Worrall also told agents that he asked Blaszczak to go into a house flipping venture with him.  (Tr. 2218 (Moore).)

Approximately five weeks later, on March 16, 2018, Blaszczak's counsel first attempted to engage with the Government on potential redactions to these FBI 302s to *Brutonize* them.  Specifically, Blaszczak highlighted various sentences in each of the FBI 302s and suggested that these sentences be redacted in their entirety.

On March 21, 2018,  the Government responded to Blaszczak's counsel to advise them that, although the Government had not yet determined which statements it intended to introduce at trial, it nonetheless had attempted to anonymize — consistent with the law in this Circuit — any statement in the FBI 302s that could potentially present a *Bruton* issue.  The Government provided a copy of its draft anonymized statements to Blaszczak's counsel.  The Government invited defense counsel to make suggested edits, or to call the Government to discuss other potential solutions in advance of trial, so as to avoid unnecessary motion practice.

On March 22, 2018, Blaszczak's counsel emailed the Government and indicated that they would not be suggesting edits but would instead be filing a motion for severance on the grounds that introducing Worrall's statements would raise insurmountable *Bruton* problems.  The severance motion was filed later that day and just days before trial.  In denying this motion, the

Court found that there was no merit to a *Bruton*-based severance argument, especially because the motion was not ripe given the Government's proposal to provide defense counsel and the Court, following Worrall's opening, with a list of the statements it intended to introduce along with its proposed redactions and substitutions.  (Dkt. 176, at 1.)

The Government thereafter sent counsel for Worrall and Blaszczak a proposal substituting Blaszczak's name in the Approach Statements with "a former colleague."  (Tr. 2198.) Worrall's and Blaszczak's counsel rejected this proposed substitution, contending that it would be obvious that Worrall was referring to Blaszczak and that it suggested Worrall was concealing Blaszczak's true identity during the approach.  (Tr. 2196-98.)  Instead, Blaszczak proposed that Blaszczak's name be used (and *not* be *Brutonized*) in the Approach Statements and that the Government should be precluded from offering certain of the Approach Statements, including, critically, Worrall's lie about only talking to Blaszczak about sports.  (Tr. 2196-97.)

After continuing to confer, the parties reached an agreement as to a redacted version of the Approach Statements that contained Blaszczak's name and included the lie about Worrall only talking to Blaszczak about sports.  (Tr. 2208-9, 2355; Dkt. 242.)  However, before HHS Special Agent Moore testified as to the Approach Statements, Worrall filed a brief contending that if Agent Moore used Blaszczak's real name when testifying about the Approach Statements, Worrall would later object to the Government offering *Brutonized* versions of the protected statements Worrall made during proffers, because that would suggest that Worrall provided CMS information to two people — Blaszczak in the Approach Statements and the *Brutonized* name used in the proffer statements.

As the Court recognized, Worrall's new position put the Government in the untenable position of prejudicing its ability to later offer Worrall's proffer statements if Worrall

opened the door to these statements during trial.  (Tr. 2212-13.)  As a result, the Government

proposed a *Brutonized* version of the Approach Statements referring to Blaszczak as "a former

colleague" and a "friend," which the Court approved.  (Tr. 2217; Court Ex. I.)  As is relevant here,

those Court-approved statements were:

- Mr. Worrall was asked about his relationship with **a former colleague**.[14]  Mr.
  Worrall stated that **he** and Worrall were friends and did not talk about work, and
  that Mr. Worrall purposefully only talked to **him** about sports.

- Mr. Worrall was then shown CMS a powerpoint presentation and a visitor's log
  that reflected that his **friend** had visited him at CMS.  In response, Mr. Worrall
  stated that he had spoken with **him** about work "generally" including discussions
  about how CMS worked and Worrall's knowledge of the agency.

During Agent Moore's testimony, the Government led her through the Approach

Statements, following the script approved by the Court.  (Tr. 2330-2332 (Moore).)  As the Court

noted, when Agent Moore referred to Blaszczak as a "former colleague" in the Approach

Statements, it did not seem artificial.  (Tr. 2334-35 (Moore); Tr. 2353 (The Court:  "As I said at

sidebar, I don't agree, as a matter of historical fact, that there was an inflection indicative of a

question.  That's point number one.  Now, I don't remember whether she pause[d] or not.  If it

was, it was not sufficiently perceptible, so that I noticed it.  I can acknowledge that you may have

perceived it that way.").)

Blaszczak requested permission to cross-examine Agent Moore on the fact that

Worrall had mentioned Blaszczak's name during the approach and was not hiding it, but the Court

denied this request, noting, among other things, that there was nothing artificial in how the

---

[14]     The bold indicates that Blaszczak's name was redacted.

statements came in and that doing so would open the door to additional statements Worrall made

about Blaszczak during the approach (like the statement about the house flipping venture) coming

into evidence — statements that were previously ruled inadmissible because, even in anonymized

form, the Court found that they too clearly referred to Blaszczak.  (Tr. 2356.)

      In its closing argument, the Government briefly discussed the Approach

Statements, arguing that Worrall lied about talking to a former colleague about work.  (Tr. 3536.)

The Government argued that Worrall lied to hide the truth that he had been providing a former

colleague with confidential CMS information.  (Tr. 3526-27.)  Contrary to the defendants' tortured

and inaccurate reading of the transcript, the Government never suggested that Worrall hid the truth

about *the identity* of the former colleague in the Approach Statements.  (Tr. 3526-27, 3605.)

      After the Government's closing, Blaszczak filed a motion for a new trial based on

the Government's references to the Approach Statements in closing.  (Dkt. 263.)  In response, the

Government noted that there was nothing problematic about the statements in its closing, but the

Government offered to make it clear to the jury in rebuttal that in the Approach Statements, Worrall

was not hiding the truth about the identity of his former colleague.  (Tr. 3726; Dkt. 264.)  Blaszczak

did not take the Government up on its offer to further clarify the record on this issue.  (Tr. 3726-

27.)

    **B.**    **Applicable Law**

      In *Bruton* v. *United States*, 391 U.S. 123, 135-36 (1968), the Supreme Court held

that admission of a non-testifying co-defendant's confession naming the defendant as a perpetrator

at their joint trial violates the latter's Sixth Amendment right to cross-examination.  The Court

later made clear that a non-obvious redaction of a co-defendant's confession to eliminate any

references to the defendant will eliminate any *Bruton* problem.  *See Gray* v. *Maryland*, 523 U.S. 185, 195-97 (1998); *Richardson* v. *Marsh*, 481 U.S. 200, 208-09 (1987).

Courts have consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does *not* violate *Bruton*.  *See, e.g.*, *United States* v. *Jass*, 569 F.3d 47, 58 (2d Cir. 2009) (the operative questions when evaluating *Bruton* claim are "(1) did the redacted statement give any indication to the jury that the original statement contained actual names, and (2) did the statement standing alone otherwise connect co-defendants to the crimes" (internal quotation marks and ellipsis omitted)); *United States* v. *Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989) (affirming conviction based in part on co-defendant's statement that was redacted to reference "others," "other people," and "another person").

To determine whether a redaction is sufficient under *Bruton*, courts view the redacted statement separate and apart from any other evidence admitted at trial.  *Id.* (citing *United States* v. *Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985)); *see also United States* v. *Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991) ("[T]he appropriate analysis to be used when applying the *Bruton* rule requires that we view the redacted confession in isolation from the other evidence introduced at trial.  If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").

Even where there is an error in admitting *Brutonized* statements, that error is subject to a harmless error analysis in light of the other evidence admitted at trial.  *See Jass*, 569 F. 3d at 64 ("[W]e determine that the other evidence of Jass's guilt was so overwhelming that, even if we had identified error in the admission of Leight's redacted confession, that error would be harmless beyond a reasonable doubt."); *Schneble* v. *Florida,* 405 U.S. 427, 428 (1972) (reviewing *Bruton*

- 48 -

error for harmlessness beyond a reasonable doubt); *United States* v. *Kirsh,* 54 F.3d 1062, 1068 (2d Cir.1995) (holding that *Bruton* error "is not ground for reversal . . . where the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the defendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error" (internal quotation marks omitted)).

### C.     Discussion

The Approach Statements were properly *Brutonized* and admitted.  First, the statements did not explicitly reference Blaszczak and, instead, referred to him as "a former colleague" and a "friend."  It was not obvious from these substitutions alone that the former colleague was Blaszczak or that the Approach Statements incriminated Blaszczak.  *See United States* v. *Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (upholding redaction of co-defendant's name to "my neighbor"); *United States* v. *Kyles*, 40 F.3d 519, 526 (2d Cir. 1994) (upholding redaction of co-defendant's name to "he"); *United States* v. *Williams*, 936 F.2d 698, 701 (2d Cir. 1991) (upholding redaction of co-defendant's name to "this guy"); *United States* v. *Benitez*, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend").  As explained at trial, CMS had a revolving door culture of employees leaving for lucrative private sector jobs, and the jury certainly appreciated that Worrall had many former colleagues, whom he could have been referring to.  (Tr. 2424 (Hartstein).)  Further, as the Court noted after Agent Moore's testimony, there was nothing artificial in her use of "a former colleague" in lieu of Blaszczak's name.  It did not suggest that the Approach Statements had been altered.  (Tr. 2353.)  Nothing more is required under *Bruton*.

Indeed, Blaszczak's current argument is hard to understand.  To the extent he claims that it was impossible to *Brutonize* these statements, his argument ignores that the whole point of

*Bruton* is to anonymize the statements so as to protect the defendants' rights while allowing the Government to prove its case, as is routinely accomplished in this District. To the extent he claims that the proposed substitutions made it obvious that Worrall was referring to Blaszczak, his argument is undercut by his own proposal to outright name Blaszczak as the subject of the Approach Statements. Accordingly, he can hardly claim prejudice now.

Similarly, there was no need to permit Blaszczak to cross-examine Agent Moore about whether Worrall used Blaszczak's name, because the substitution was not artificial. In fact, had the Court permitted such cross–examination — which would have clearly identified Blaszczak as the former colleague — it would have undermined the entire point of *Brutonizing* the statement and opened the door to the other statements (previously excluded) favorable to the Government's case and prejudicial to Blaszczak. For example, with Blaszczak identified as the former colleague, the Government would have been permitted to introduce Worrall's statements during the approach that he and Blaszczak discussed entering into a house flipping venture together. This statement would have been probative evidence of the benefit Worrall expected from tipping Blaszczak — a disputed element at trial.

Nor did the Government ever suggest that Worrall concealed the identity of Blaszczak in the Approach Statements. In its closing argument, the Government made clear that the Approach Statements proved that Worrall hide the truth about the nature of his relationship with a former colleague (particularly about things they would and did discuss), not the identity of the former colleague. To erase any hypothesized confusion, the Government offered to clarify in its rebuttal summation that the Government did not contend that Blaszczak hid the name of his former colleague. Blaszczak refused this offer. In addition, the Government never explicitly argued that the "former colleague" was in fact Blaszczak, but instead pointed to other information

properly adduced at trial that suggested that Worrall lied because he was providing the former colleague with confidential CMS information.  Courts have routinely held that *Bruton* is not implicated when the jury would have to refer to other trial evidence to link the defendant to the redacted statement.  *See Richardson,* 481 U.S. at 208 (placing outside scope of *Bruton* rule statements that incriminate inferentially only by reference to "evidence introduced later at trial").

Finally, any error in admitting the Approach Statements was harmless.  As noted above, Blaszczak was convicted at trial of ten counts because there was overwhelming evidence that he obtained and disseminated confidential CMS information for profit.  This evidence consisted of Blaszczak's explicit emails, the testimony of CMS employees, and the testimony of two cooperating witnesses.

## POINT VIII

### THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT WORRALL CONVERTED GOVERNMENT PROPERTY AND COMMITTED WIRE FRAUD

Worrall argues that there was insufficient evidence to support his convictions for conversion of government property (Count Three) and wire fraud (Count Nine), each of which relate to his providing nonpublic information about the CMS July 2012 radiation oncology rate cuts to Blaszczak, which Blaszczak then provided to Huber, Olan, and Fogel to inform their trading decisions.  (Worrall Br. 5-15.)  Worrall made these same arguments to the jury in his summation, and the jury rejected them, as should the Court on this Rule 29 motion.  (Tr. 3570-95, 3609-41.)

Based on the evidence at trial, a rational jury could, and did, conclude that Worrall provided confidential CMS information to Blaszczak regarding upcoming proposed cuts to radiation oncology reimbursement rates.  As an initial matter, ample evidence supported the fact that Worrall had access to the information in question.   Worrall, who served as a senior technical

- 51 -

advisor to the head of CM, John Blum — had access to various rules that CMS was considering, including the proposed radiation oncology rule in 2012.  (Tr. 372 (Blum); Tr. 1984 (Bassano); GX 1337.)  In his position as a senior technical adviser to Blum, it was not "unusual" for Worrall to discuss predecisional information, including upcoming proposed or final rules, with other senior CMS officials, such as Bassano who was in charge of HAPG, the group responsible for the relevant radiation rate changes.  (Tr. 1986 (Bassano).)  Worrall concedes, as he must, that he attended briefings with senior CMS management "at which proposed and final rules (among other topics) could theoretically have been discussed."  (Worrall Br. 6; Tr. 1985, 2115 (Bassano); Tr. 2419 (Hartstein).)  As adduced at trial, Worrall himself also told federal agents that he "coordinated and communicated with many people within the agency and had his hand in a lot of data . . . that he had his hands in everything" at CMS.  (Tr. 2328 (Moore).)  Worrall was also the project manager for a confidential, nonpublic CMS database that contained CMS's most up-to-date claims data that CMS used to inform its decision-making.  (Tr. 231, 300-01 (Blum); Tr. 2018-20 (Bassano); Tr. 2330 (Moore).)

Based on this evidence, a reasonable jury could easily infer, as it did here, that Worrall had access to the nonpublic information about CMS upcoming radiation oncology cuts. *See Espaillet*, 380 F.3d at 718 ("court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt"); *Autuori*, 212 F.3d at 114 (in a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter").  The jury rejected Worrall's arguments  — that he did not receive the nonpublic information by email and that no witness could recall whether or not he attended a specific briefing at which the proposed radiation oncology rule was discussed — and

there is no basis for the Court to "usurp the role of the jury." *Autuori*, 212 F.3d at 114; *see also Zayac*, 765 F.3d at 117 ("the jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence").

There was also substantial evidence adduced at trial supporting the jury's conclusion that Worrall passed nonpublic CMS information about the upcoming July 2012 radiation oncology rule to Blaszczak. The Government offered evidence of the compelling timeline that linked Worrall and Blaszczak meeting with Blaszczak's provision of the relevant confidential CMS information to the Deerfield traders. For example, Blaszczak met with Worrall at CMS on May 8, 2012, when Worrall signed Blaszczak into CMS's headquarters at 12:10 p.m. (GX 1947-A).[15] The next day, May 9, 2012, at 11:19 a.m., Blaszczak emailed Fogel asking for a phone call, "Want to update you on one of your favorite topics." (GX 1947-A.) During the phone call — about which Fogel testified and which was corroborated by Fogel's notes of the call — Blaszczak provided Deerfield with confidential CMS information regarding radiation oncology. (Tr. 739-86 (Fogel); GX 806, GX 809.) The information that Blaszczak relayed to Deerfield had been discussed at an internal CMS meeting just a few weeks earlier. (GX 1309.) Based on the information that Blaszczak relayed, on May 10, just two days after the Blaszczak-Worrall meeting, Deerfield began to short Varian, Accuray and Elekta. (GX 3000.) Blaszczak and Worrall continued to communicate leading up the CMS's public announcement of the rule. (GX 3010.) The evidence thus established a pattern: contact between Blaszczak and Worrall, followed by

---

[15]     Notably, the meeting that Blaszczak was ostensibly there to attend had started at 8:15 a.m. that morning. (DX 15.)

Blaszczak contacting Deerfield, followed by Deerfield executing more shorts of companies that would be impacted by radiology oncology rate cuts.  (*Id*.).

In addition to this evidence that was specific to communications around radiation oncology, the jury was also entitled to rely on the testimony from multiple witnesses that Blaszczak obtained nonpublic CMS information for sources inside CMS (Tr. 646 (Fogel); (Tr. 1529 (Samuels); Tr. 1762 (Plaford); Tr. 2521 (Epple));[16] and that Worrall was Blaszczak's main inside source at CMS (Tr. 1529 (Samuels); Tr. 2521 (Epple)); *see also* GX 1705 (Hoffman referring to Worrall: "Great on your well placed source!!"); GX 1511 (Hoffman referring to Worrall:  "I have to protect Dave's source.").

The conclusion that Worrall was Blaszczak's source was also buttressed by the evidence that Blaszczak called Worrall immediately after the publication of an October 2014 *Wall Street Journal* article reporting that the SEC was investigating Blaszczak.  (Tr. 2582-82 (Epple).) The jury was entitled to infer that Blaszczak called Worrall after this article because Worrall was Blaszczak's inside source and because Blaszczak was checking whether the SEC had asked about their illicit relationship.

While it is true the jury acquitted Worrall of being the source of other information that flowed from Blaszczak, that in no way undermines the fact that a rational jury could conclude based on both the specific timeline relating to the radiation oncology leaks and trading, coupled with the more general evidence relating to Worrall serving as a source for Blaszczak, that Worrall was the source of information relating to the radiation oncology cuts.  *See United States* v. *Mahaffy*, 499 F. Supp. 2d 291, 295 (E.D.N.Y. 2007), *aff'd*, 283 F. App'x 852 (2d Cir. 2008), and *aff'd*, 693

---

[16]     This includes testimony from Fogel that Blaszczak's source for the radiation oncology tip was a CMS insider.  (Tr. 746 (Fogel).)

F.3d 113 (2d Cir. 2012) ("The jury's verdicts of acquittal on counts 2 through 41 are not dispositive in evaluating the sufficiency of the evidence on Count 1 . . . Analysis is focused on the evidence which had been adduced at the trial.").

From this evidence, a rational trier of fact could easily conclude that Worrall was the source of the nonpublic information about the 2012 proposed radiation oncology rule.[17]

Instead of confronting this evidence, Worrall rehashes his claim that CMS disclosed this highly sensitive and confidential CMS information during a public HCPCS meeting. (Worrall Br. 9.) He then makes the contradictory argument that another CMS employee (perhaps Anne Hauswald, Janet Brock, or Marc Hartstein) may have been the source of the leak. (Worrall Br. 9-13). There is no evidence to support these fictional narratives. (Tr. 2402 (Hartstein) (denying leak); Tr. 2891 (Brock) (same).). In any event, the jury rejected the arguments. And Worrall has not come close to meeting his "very heavy burden" of showing that the jury's verdicts were supported by insufficient evidence. *Mi Sun Cho*, 713 F.3d at 720.

---

[17]    Any argument that this information was public is also firmly belied by the record, including testimony from Bassano and Hartstein, senior CMS officials in charge of the proposed radiation oncology rule, expressing surprise that Blaszczak's research note contained "[s]pecific information about the cuts in radiation oncology and the particulars of the policy we were going to be proposing," and their belief that this information could only have come from a CMS "colleague[]." (Tr. 1975, 2118-19 (Bassano); Tr. 2386-89, 2401-02 (Hartstein).)

## CONCLUSION

For the above reasons, the Court should deny the defendants' Rule 29 motions because the evidence amply supported their convictions, and their Rule 33 motions because they have failed to meet their burden that "the interest of justice so requires."  Fed. R. Crim. P. 29 & 33.

Dated: New York, New York                    Respectfully submitted,
      July 13, 2018

                                             ROBERT KHUZAMI
                                             Attorney for the United States
                                             Acting Under Authority Conferred
                                           by 28 U.S.C. § 515

By:          /s/
                                             Ian McGinley
                                           Joshua A. Naftalis
                                           Assistant United States Attorneys
                                           Tel.: (212) 637-2257/2310